# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

PEOPLE OF THE STATE OF NEW YORK, by
LETITIA JAMES, Attorney General of the State of
New York,

                    Plaintiff,

                    v.

MONEYLION INC,

                    Defendant.

**SUMMONS**

Index. No. _____

Index No. Purchased: 4/14/25

TO THE ABOVE-NAMED DEFENDANT:

        You are hereby summoned to answer the Complaint in this action and to serve your answer or, if the Complaint is not served with this Summons, to serve a notice of appearance, on the Plaintiff's attorney within twenty (20) days after service of this Summons, exclusive of the day of service (or within thirty (30) days after service is complete if this Summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

        The basis of venue under CPLR § 503 is that Plaintiff is located in New York County, with its address at 28 Liberty Street, New York, NY 10005, Defendant is located in New York County, with its address at 30 W. 21st Street, New York, NY 10010, and a substantial part of the events and omissions giving rise to the claims occurred in New York County.

Dated: April 14, 2025
New York, New York

LETITIA JAMES
Attorney General of the State of New York

By: _____

Christopher L. Filburn
*Assistant Attorney General*
Bureau of Consumer Frauds & Protection
28 Liberty Street, 20th Floor
New York, New York 10005
Tel.: 212.416.8303
Email: christopher.filburn@ag.ny.gov

Of counsel:

Jane M. Azia
*Bureau Chief*

Laura J. Levine
*Deputy Bureau Chief*

*Counsel for Plaintiff People*
*of the State of New York*

2

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

PEOPLE OF THE STATE OF NEW YORK, by
LETITIA JAMES, Attorney General of the State of
New York,

                    Plaintiff,

                    v.

MONEYLION INC,

                    Defendant.

**COMPLAINT**

Index No. _____

Plaintiff People of the State of New York, by their attorney, Letitia James, Attorney

General of the State of New York (the "OAG"), bring this action against Defendant MoneyLion

Inc. ("MoneyLion" or "the Company") alleging as follows:

## INTRODUCTION

1.     Beginning when it was still just a colony, decades before declaring Independence,

New York adopted usury legislation to protect its most vulnerable residents from high-cost lending

that preys on economic fragility and weakened bargaining positions. In the centuries that followed,

strengthened prohibitions on usury have been enacted on multiple occasions, including laws that

overrode judicially imposed usury limits and the addition of criminal penalties for usury, among

other enhancements. This long and unbroken history reflects a clear declaration of public policy

by New York's legislature: lending at usurious rates, even where freely entered into, is financially

unhealthy and destructive, and therefore is not permitted within the state of New York.

2.     Efforts by lenders to circumvent New York public policy are almost as old as the

prohibition on high-cost lending itself. New York's highest court "has recognized for more than a

century that the economy changes" and that, as these changes occur, new opportunities come about

Case 1:25-cv-04093    Document 1-1    Filed 05/15/25    Page 5 of 58

for "lenders to extract unlawful interest rates through novel and increasingly sophisticated instruments." *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 342 (2021). Thus, the Court of Appeals instructs: "if the court can see that the real transaction was the loan or forbearance of money at usurious interest, its plain and imperative duty is to so declare." *Id*. Embracing this call to action, New York courts have repeatedly applied usury prohibitions to loansharks, payday lenders, and others who exploit New Yorkers through illegal, abusive lending practices.

3.      This action concerns a modern, technology-driven attempt to evade New York's usury laws. In the transactions at issue here, users obtain advances for $100 or less and typically agree to pay fees and tips from $5 to $10, reflecting exorbitant and plainly usurious costs of credit. In exchange, users also provide open-ended authorization for future deductions from their bank to repay these amounts, typically in 7 to 10 days. The parties expect this repayment will occur: there are barriers to revoking authorization, the lending program terminates if no repayment is made, and the lender treats the amounts it lends as principal and the fees and tips it collects as interest. And the results are clear: in the absence of actual fraud, repayment is a virtual certainty. For all these reasons and others, this is lending, plain and simple—and usurious lending at that. Such activity contravenes centuries of New York law and policy, and it should be barred.

*               *               *

4.      MoneyLion makes small-dollar, short-term, high-cost loans (each, a "Paycheck Advance") under the brand name "Instacash" to tens of thousands of New Yorkers. In a typical transaction, an Instacash user will request a $50 Paycheck Advance. If she wants the money right away (and she nearly always does) she pays a $4.99 fee, while the Company repeatedly pressures her to pay an additional $2 tip. In exchange, a user must authorize MoneyLion to debit linked payment methods as often as needed for the Company to collect. At the end of this typical Instacash

2

transaction, the user will have paid MoneyLion $56.99 to obtain a ten-day, $50 Paycheck Advance—an illegal, usurious annualized percentage rate, or APR, of more than 350%.

5.      MoneyLion entices consumers to sign up for Instacash by promising two things: instant access to funds for emergency expenses—the name "Instacash" says it all—and a "free" product that charges zero percent interest or APR. Both claims are fundamentally deceptive. As to the former, Instacash users cannot obtain Paycheck Advances with immediate terms and immediate funds disbursement without paying for it, a fact that MoneyLion typically obscures or even omits entirely from the Company's marketing materials. As to the latter, fees charged to Instacash users and tips collected by MoneyLion act solely as revenue that boost the Company's bottom line and thus constitute interest expenses for its high-cost Paycheck Advances.

6.      MoneyLion, moreover, is relentless in charging fees and pressuring users for tips. The Company preselects loans with immediate terms for users, makes it artificially difficult for users to avoid fee-based Paycheck Advances, and enforces undisclosed transaction limits to require repeat usage (and collect repeat fees). The Company also employs sophisticated algorithms and dynamic models to pressure users to tip, designs and deploys manipulative tactics, guilts users into tipping, and implicitly threatens negative consequences for those users who do not.

7.      MoneyLion aggressively safeguards its ability to collect its fees and tips. The Company scientifically projects the timing and amount of Instacash users' next direct deposits of wages or other income: MoneyLion uses its projection of future direct deposit size to ensure that the amounts it lends to Instacash users will be collectable; and MoneyLion its projection of future direct deposit timing to ensure that the Company is first in line to new money. Through these methods, MoneyLion prioritizes its own repayment over Instacash users' ability to use their recently deposited wages or income to pay rent or bills, to buy groceries, medicine, or necessities,

or to save for the future. In total, the Company's illegal, deceptive, and abusive practices have enabled MoneyLion to extract tens of millions of dollars from working-class New Yorkers.

8.      The result is financial hardship: Instacash users have less money in the bank after MoneyLion first collects its amounts lent, fees, and tips from users' direct deposits of wages or income. Facing fresh shortfalls, Instacash users go back for more, piling up new amounts owed, more fees, and higher tips each time, until they are utterly dependent on regular and repeat access to MoneyLion's high-cost Paycheck Advances. The Company facilitates this destructive behavior by obscuring any risks of dependency, protecting its own bottom line, and aggressively encouraging increased usage through temporary boosts to the amounts it will lend.

9.      Plaintiff OAG alleges that Defendant violated Executive Law § 63(12) by engaging in repeated and persistent illegal conduct through usurious lending in violation of state usury laws (Counts I and II). Plaintiff OAG also alleges that Defendant violated Executive Law § 63(12) by engaging in: repeated and persistent fraud (Count III); repeated and persistent deceptive acts or practices in violation of General Business Law ("GBL") § 349 and the Consumer Financial Protection Act ("CFPA") (Counts IV & VI); repeated and persistent false advertising in violation of GBL § 350 (Count V); and repeated and persistent abusive acts or practices by rendering Instacash users dependent on high-cost credit in violation of the CFPA (Count VII).

10.     The Court should enjoin Defendant from engaging in illegal, deceptive, and abusive conduct, should order Defendant to provide an accounting of its usurious lending, and should award restitution, disgorgement, damages, civil penalties, and other relief as appropriate.

### PARTIES & JURISDICTION

11.     Plaintiff is the People of the State of New York, by their attorney, Letitia James, the New York Attorney General and is authorized to take action to enjoin repeated and persistent

fraudulent and illegal conduct under Executive Law § 63(12), deceptive business practices under GBL § 349, and deceptive or abusive acts or practices under the CFPA.

12.     Defendant MoneyLion Inc. is a Delaware corporation with its principal place of business at 30 West 21st Street, 9th Floor, New York, New York 10010.

13.     Plaintiff has provided Defendant with notice as specified in GBL § 349.

14.     This Court has jurisdiction over this action under Executive Law § 63(12), under which the OAG is empowered to see injunctive relief, restitution, damages, and other equitable relief for repeated and persistent fraudulent or illegal acts or practices

15.     This Court has personal jurisdiction over Defendant because it is located in New York and because the causes of action arise from Defendant's contracting with New Yorkers to supply goods and services in New York and from Defendant committing of tortious acts within and without New York causing injury within New York. CPLR § 302.

16.     Venue is proper because the parties reside in this county, because a substantial amount of the transactions, practices, and courses of conduct at issue occurred within this county, and because Defendant conducts business in this county. CPLR § 503.

## FACTUAL ALLEGATIONS

**I.     MONEYLION OFFERS ONLINE CONSUMER FINANCIAL PRODUCTS, INCLUDING INSTACASH LOANS, THROUGH ITS MOBILE APP**

17.     MoneyLion is a technology company that offers banking, lending, and other consumer financial products and services directly to consumers throughout the United States. The Company interacts with consumers predominantly online and through its mobile app.

18.     MoneyLion claims it enhances financial wellbeing for working-class consumers by increasing access to banking services and financial literacy tools. As one of the Company's own

guide documents states: "Our target market is the 70% of hard working and gig economy Americans who do not want fees at their financial institutions and have little in savings."

19.     At its founding, MoneyLion's key product was a bank account, which the Company called a "RoarMoney" account, offered online or through its app. RoarMoney accounts are offered in partnership between MoneyLion and one or more banks, and were intended to provide basic deposit accounts, debit cards, and other banking-like services to underbanked sectors.

20.     Over time, MoneyLion has offered a variety of consumer financial products through its app, both to RoarMoney account holders and directly to consumers who do not have RoarMoney accounts. These products include a membership program that provides access to loans and other financial tools, investment accounts, and crypto-related products.

21.     In 2019, MoneyLion began to offer Paycheck Advances under its "Instacash" label. The Company advertises Instacash as one of several "earned wage access" products available to consumers. These products purport to offer hourly workers who are paid every two weeks or on other fixed cycles access to wages that they have "earned" because they have worked during their current pay period, but which they have not yet been paid by their employers.

22.     MoneyLion initially developed Instacash as a recruitment tool that was designed to attract consumers to open RoarMoney accounts. As part of this strategy, the Company made Paycheck Advances through Instacash available only to MoneyLion users who arranged for their pay or other income to be direct deposited into their RoarMoney accounts.

23.     Like virtually all "earned wage access" providers, MoneyLion publicly asserts that it is not engaging in lending but merely providing users with wages that have already been earned. But MoneyLion has no relationship to employers and no access to real-time wage and hour data. As alleged further below, when it makes a Paycheck Advance, MoneyLion relies on its own

projections of future direct deposits, not any concrete evidence that the user who is requesting the Paycheck Advance has "earned" any wages at the time of the request.

24.     MoneyLion also asserts that its Paycheck Advances are not loans. The Company's business plans for Instacash, however, describe Paycheck Advances as "single payment loans" and state that the due date of the "loan should be on next pay date." In communications among themselves, MoneyLion employees refer to amounts owed by users as "principal" while the Company's business plans refer to its "exposure" as the "principal exposed." And the Company tracks the impacts that changes to its algorithms and modeling have on its "loan books."

25.     Indeed, when a user hovers over the "Borrow" link on MoneyLion's website, one of the links presented for users to select is a "Cash Advance" link, as shown below:



If a user clicks on the "Cash Advance" link, she is taken to MoneyLion's "Earned Wage Access" page that includes several prominent advertisements for Instacash.

26.     MoneyLion also closely tracks default rates on its Paycheck Advances to maintain "target limits." It engages in what it describes internally as "collections" activity. And it tracks loan-to-value ratios to determine whether Instacash is driving growth.

27.     Like most lenders, MoneyLion determines and periodically adjusts its acceptable credit risk levels by so that it can prioritize repayment rates or loan volume based on its current business strategy. The Company routinely evaluates its underwriting criteria, such as eligibility thresholds, to adjust repayment rates, and changes are reviewed by the Company's Credit Risk

7

team. In addition, the Company's Credit Committee analyzes performance by tier and in total regularly, including analyses of "Credit Loss performance" among Instacash users.

28.     MoneyLion also scores Instacash users into credit segments, tracking the "unpaid principal rate" of those segments to identify "high risk" users. The Company has experimented with trial programs for users who have their attempts to obtain Paycheck Advances rejected "to help them show us evidence of creditworthiness and migrate them over a few cycles." And MoneyLion developed its own "Roarscore" model "to improve our ROI on IC repayment," finding that it "seems to have high accuracy and high recall at predicting" repayment.

29.     Over time, MoneyLion has repositioned Instacash away from being a recruiting tool for RoarMoney accounts towards being a direct-to-consumer product. Several years ago, the first product a visitor to www.moneylion.com would see advertised was the RoarMoney account. For the past few years, the first product advertised has been Instacash. The Company also eliminated the requirement to have a RoarMoney account to be eligible for Instacash; instead, consumers can access Instacash by linking any external bank account to MoneyLion's app. And the Company has experimented with what it calls "Trial Instacash" programs designed to attract consumers to Instacash that MoneyLion does not expect will open RoarMoney accounts.

30.     MoneyLion also actively works to encourage its RoarMoney account holders who do not regularly obtain Paycheck Advances to begin using Instacash, such as by experimenting with offers to such users to refund Instacash fees for their first Paycheck Advance.

## II.     MONEYLION DECEPTIVELY MARKETS INSTACASH AS AN INTEREST-FREE AND NO-COST PRODUCT USED TO OBTAIN CASH ON DEMAND

31.     MoneyLion extensively markets Instacash to consumers using various channels, including on the Company's website, through advertisements placed online and on social media,

and with video advertisements on YouTube and TikTok. The Company's Instacash marketing prioritizes two key supposed features: instant funds availability and no interest expense.

32.     As to the feature of immediate funds availability, the name "Instacash" says it all. MoneyLion ads state that Instacash will help fund "emergency expenses" or provide consumers "extra cash" on demand. One ad describes Instacash as providing access to Paycheck Advances "anytime" while another states that Instacash provides "money you can get when you need it most," such as to pay for an "unexpected parking ticket, a sudden car breakdown, a leaky roof, or a last-minute dinner party." The Company similarly touts Instacash for when consumers "need fast cash." These ads, however, often make no mention of fees for immediate disbursement.

33.     For example, in one online video advertisement, MoneyLion displays the process of obtaining a Paycheck Advance through Instacash. The advertisement prominently displays to consumers a button, highlighted in green, that reads: "GET $25 NOW." However, as illustrated by the following screenshot, the advertisement never displays the required fee:



34.     MoneyLion also frequently asserts in advertisements that there are no interest expenses associated with Instacash. The Company's website declares: "There's no interest charged." In other places on its website, MoneyLion describes Instacash as "0% APR." And when discussing the costs of Paycheck Advances obtained through Instacash, MoneyLion's website describes its Paycheck Advances through Instacash as "interest-free" transactions.

35.     MoneyLion also uses text messages and pop-up notices that encourage consumers to "Get your first Instacash advance" by unlocking "up to $250 in interest free cash." The Company's social media advertising contains similar messaging around interest expense:




## III.   CONSUMERS USE INSTACASH TO OBTAIN ADVANCES THAT ARE REPAID THROUGH MONEYLION'S DEBITS OF CONSUMER BANK ACCOUNTS

36.     MoneyLion's app users agree to the Company's terms and conditions, including Instacash agreements, before they are eligible to obtain a Paycheck Advanced through the app. Those agreements are governed by the law of the state in which the user resides.

37.     Consumers who want to obtain Paycheck Advances through Instacash must either have a RoarMoney account or link an external bank account to MoneyLion's app. The Company's agreements provide that whenever a user requests a Paycheck Advance they also authorize the

Company to debit her selected RoarMoney or linked external bank account for the amounts owed, plus fees and tips. And if the account lacks funds, the user's request also authorizes the Company to debit other bank accounts or charge other payment methods linked to its app.

38.    MoneyLion aggressively employs these authorizations. Training materials instruct employees to "retry payments every day until repaid" and that when "there is not enough in the customer's accounts, we may take a partial repayment and try again the next day."

39.    Finally, in its agreements, MoneyLion warrants that it will not pursue legal action or engage in debt collection activities to obtain repayment of Paycheck Advances. However, MoneyLion refers internally to its automated debit process as "automated collections" or its "automated retry logic," which is a central part of its "collections process."

40.    The centerpiece of MoneyLion's business model for Instacash is the Company's extensive and rigorous analysis, tracking, and future projection of users' direct deposits into the RoarMoney account or external bank account that a user links to the Company's app.

41.    When users sign up for MoneyLion's app to access Instacash, the agreements state that the Company must be able to detect at least three recurring deposits into linked RoarMoney accounts or external bank accounts before users will become eligible for Instacash.

42.    Once the Company detects the deposits, it projects that anticipated size of the next deposit and makes available only a fraction of that deposit in the form of Paycheck Advances, thereby ensuring that future deposits will be sufficient to repay the Company in full.

43.    In addition to ensuring that projected amounts of future deposits will be sufficient to repay itself (plus fees and tips), MoneyLion makes extensive efforts to ensure that it will be first in line to new money in users' accounts. When a user obtains a Paycheck Advance, MoneyLion sets the repayment date as the date it projects for the user's next direct deposit.

2

44.     From the launch of Instacash in 2019 forward, MoneyLion has tested and experimented to develop the ideal "due date prediction" for Instacash. The goal for the Company throughout has been "predicting and detecting users paycheck" to line up with repayment. And the Company constantly refines its model "to smoothen DD detection/predictions."

45.     The precision of its modeling to ensure repayment of Paycheck Advances is central to making Instacash profitable. Before launch, the Company's engineers focused on creating an "architecture to be able to detect individual DD in near-real time." The Company's founder often sent messages to his team when Instacash repayments were not quickly taken from his personal direct deposits during testing, stressing the need for "immediate debits upon payroll." He inquired whether employees were "watching instacash tonight to make sure debits are happening immediately as payroll hits," emphasizing "it needs to be near instant." He also complained that his "payroll has been deposited 1 hour ago" but the repayment of "$115 instacash still hasn't been taken out," which other employees promised to address "in the next couple of hours."

46.     Today, MoneyLion times its debits to obtain repayment for Paycheck Advances immediately after users receive new direct deposits. The reason is simple: as the Company acknowledges, its ability "to initiate repayment on a per user basis as soon as DD hits" will "improve and collect on most payments." Today, the Company's model is so aggressive at being first in line to new money that MoneyLion regularly receives complaints from users when its projections cause the Company to attempt debits shortly before direct deposits are made, triggering overdraft and other banking fees for users with linked external bank accounts.

47.     For Instacash users who link Instacash to their RoarMoney accounts, MoneyLion takes this aggression a step further, as the Company's control over these accounts permits it to "prioritize" its automatic debits of accounts to obtain repayment "over other transactions."

3

48.     The result of this automatic debit process is very high collections rates, as MoneyLion successfully collects on more than 95% of all fee-based Paycheck Advances.

49.     MoneyLion's true collections rates are much higher. One analysis by the Company found that the vast majority of Instacash repayment failures were due to bad actors who were defrauding the Company, such as users who created 5 or more Instacash accounts that were associated with a single mobile device. In contrast, for devices that had fewer than 5 Instacash accounts associated with them, the Company's collections rates were nearly 98%.

50.     MoneyLion enhances its collections by imposing substantial hurdles on users' ability to avoid repayment—notwithstanding the Company's promises that Paycheck Advances carry no obligation to repay and that the only consequence will be a loss of Instacash.

51.     As an initial matter, MoneyLion strictly enforces a policy of barring users from Instacash in the event the user does not pay back a Paycheck Advance. As Instacash is marketed (and used) as a source of frequent and repeat transactions, strict enforcement of this policy reflects both MoneyLion's and users' expectations that repayment will be made. And those expectations align with reality, including the near-100% collections rate on non-fraud transactions.

52.     Moreover, MoneyLion provides no notice, reminder notifications, prompts, or other deadlines or revocation information directly within Instacash about the process for removing payment authorization once a user obtains a Paycheck Advance through Instacash.

53.     This lack of readily available information makes it particularly complicated for users since MoneyLion requires users to provide three business days' notice before it will treat a user's revocation of debit authorization to be valid and enforceable. The notice requirement makes revocation entirely impossible for Paycheck Advances with short terms. And even where

4

Case 1:25-cv-04093    Document 1-1    Filed 05/15/25    Page 17 of 58

revocation might have been possible, the notice period of three business days means that many users will need to submit revocation nearly a week before repayment is scheduled.

54.     MoneyLion makes the process of revoking debit authorizations needlessly difficult as well. At the launch of Instacash, users were required to provide the Company with written notice of revocation, despite the fact that those users' prior interactions with MoneyLion almost certainly occurred entirely over the Company's app. Even today, while the Company provides an in-app revocation method, the process is not well explained or clearly highlighted: In contrast to the "One-Click" process that makes is quick and easy for users to obtain another Paycheck Advance, there is no clear and straightforward "revoke debit authorization" button to click in the app. Instead, users must navigate an unintuitive and more complex process across multiple menus to de-link all authorized payment methods that they have ever added to the Company's app.

55.     Further, users who do go through the entire process of de-linking all authorized payment methods from MoneyLion's app effectively render the app useless. Users who attempt to revoke debit authorization not only lose access to future Paycheck Advances through Instacash, but also to any other features of the MoneyLion app that require payment. And RoarMoney account holders must effectively give up their bank accounts to revoke their authorizations.

## IV.     MONEYLION CHARGES AND RECEIVES INTEREST VIA INSTACASH

### A.     MoneyLion Charges Interest by Assessing Fees for Paycheck Advances that Have Terms that Begin Immediately Rather than in 48 Hours or Later

56.     When users navigate MoneyLion's app to obtain Paycheck Advances through Instacash, they eventually must elect either a Paycheck Advance with an immediate term—meaning that funds will be disbursed to users within minutes—or a Paycheck Advance with a term that begins 48 hours or later—meaning that funds will be disbursed to users days later.

5

57.     MoneyLion does not characterize Instacash as offering users two distinct Paycheck Advances with two different terms. Instead, the Company instead presents users the choice in its app to either select immediate disbursement of funds in exchange for what MoneyLion calls a "TurboFee" or select delayed disbursement of funds for no TurboFee.

58.     At launch of Instacash, MoneyLion charged $3.99 for Paycheck Advances with immediate terms and disbursement to a RoarMoney account and charged $4.99 for Paycheck Advances with immediate terms and disbursement to an external bank account.

59.     In November 2021, MoneyLion adopted a new fee schedule that charged fees that varied by the size of disbursement amount, starting at $0.99 (RoarMoney) or $1.99 (external) for immediate-term Paycheck Advances of $5 or less and increasing up to $5.99 (RoarMoney) and $7.99 (external) for immediate-term Paycheck Advances between $90 and $100.

60.     Beginning on October 12, 2022, and through today, MoneyLion's fee schedule starts at $0.49 (RoarMoney) and $1.99 (external) for immediate-term Paycheck Advances of $5 or less and increases up to $6.99 (RoarMoney) and $8.99 (external) for immediate-term Paycheck Advances between $90 and $100. The full fee schedule is shown below:

### Instacash Turbo Fee

| Disbursement Amount | RoarMoney account | External account |
|---|---|---|
| $5 or less | $0.49 | $1.99 |
| $10 — $25 | $1.99 | $3.99 |
| $30 — $45 | $2.99 | $4.99 |
| $50 — $65 | $3.99 | $5.99 |
| $70 — $85 | $5.49 | $7.49 |
| $90 — $100 | $6.99 | $8.99 |

6

61. MoneyLion pushes users to select Paycheck Advances with immediate terms by pre-selecting such options. For example, a user who attempts to obtain a Paycheck Advance through Instacash will see the following summary screen in the Company's app:



As this exemplar screenshot shows, MoneyLion prods users to request Paycheck Advances with terms that begin immediately (and which incur the Company's TurboFees) by: (i) making immediate loan terms the default option; (ii) emphasizing the receipt of funds "within minutes"; (iii) highlighting the "Confirm" button in bright colors, in contrast to the grayed-out option to "Edit my options"; and (iv) requiring users to navigate to separate screens to alter the terms.

62. Instacash users who attempt to avoid fees are met with resistance. For example, MoneyLion displays the following screen to push Paycheck Advances with immediate terms:

7

As illustrated by this exemplar screenshot, MoneyLion pushes users to select Paycheck Advances with immediate terms both by emphasizing the ability to obtain funds immediately and by making the fee-based Paycheck Advance more prominent through a colored "Get cash now" button.

63.     To further drive revenue generated by Paycheck Advances with immediate terms, MoneyLion has adopted a "One-Click" process for Instacash that enables users to obtain new Paycheck Advances with the click of a single button. These One-Click options come with "pre-filled" choices made by MoneyLion, including terms that begin immediately.

8

64.     MoneyLion expects users to select Paycheck Advances with immediate terms and disbursement most of the time. In one study, for example, the Company noted from "past experience" that users "dont really look at TurboFees as a decisioning criteria."

65.     From October 28, 2018 to December 31, 2023 (the "Data Period"), MoneyLion assessed a fee on nearly nine out of every ten Paycheck Advances made through Instacash, successfully collecting its fee on nearly 96% of those loans. In total, the Company collected more than $24.6 million in fees from New Yorkers during the Data Period.

66.     MoneyLion's fees for Paycheck Advances with terms that begin immediately impose substantial costs of credit on Instacash users. During the Data Period, the most common Paycheck Advance obtained by Instacash users was $100 for a $8.99 fee and was scheduled to be repaid in two weeks. That $8.99 represents an APR of about 234%. The second-most-common Paycheck Advance was $50 for a $4.99 fee and was scheduled to be repaid in two weeks and an APR of about 260%. The third-most-common Paycheck Advance was for $100 with a $8.99 fee, but with repayment in one week and an APR well in excess of 450%.

67.     While the fees imposed on Instacash users for immediate terms are substantial, the costs to MoneyLion are minimal. The Clearing House, which operates a real-time payment network, states that per-transaction charges for users of its network, such as MoneyLion, are less than 5 cents—a fraction of what MoneyLion charges Instacash users. And when accounting for fees paid for Paycheck Advances with immediate terms in its audited financials, the Company recognizes its fee revenue as gross rather than net because the services the Company provides related to those "fees are not distinct from the services of the Instacash advance."

68.     For RoarMoney account holders, any difference in the Company's "costs" between immediate and delayed terms is entirely illusory. MoneyLion controls RoarMoney accounts,

9

meaning that there are no external transfers necessary and no additional costs for real-time payments. MoneyLion instead artificially slows deposits for no-fee Paycheck Advances sent to RoarMoney accounts, a process it describes as "Delayed Deposits" or "Delayed RM." Its internal tracking categorizes these transfers as "DELAYED_ROAR_MONEY."

### B. MoneyLion Receives Interest by Relentlessly Pushing Users to Tip the Company in Connection with Each Paycheck Advance they Obtained

69. When users navigate MoneyLion's app to obtain Paycheck Advances through Instacash, they are be prompted to pay a tip to the Company for each Paycheck Advance.

70. MoneyLion publicly asserts that tipping is optional and that Instacash users will not suffer adverse consequences for choosing not to tip. But the Company also attempts to extract tips aggressively, pushing users to tip through guilt. For example (emphases added throughout): "So each time you take an interest-free cash advance, you'll have an opportunity to leave an optional small tip. And it's wonderful to see *great folks like you leaving tips* to support this empowering feature." Another MoneyLion display encourages users to tip "what you think is *fair*." And a third reminder suggests that tips "help us cover the high costs of keeping Instacash interest-free and readily available to as many members as possible. *We're all in this together*."

71. Other efforts by the Company to push tips carry implicit threats that users will not continue to be able to access Instacash on the same terms in the absence of generous tipping. For example, MoneyLion tells users that "tips are what help us cover the high costs of administering Instacash at 0% APR for the large and growing MoneyLion community." In another message pushing users to tip, MoneyLion warns that "it takes money to keep 0% APR Instacash running, so please consider a tip to help keep it free." And in another in-app reminder, the Company suggests that users' "participation will help us ensure that we can keep offering the product"— implying that a failure to tip regularly will lead to a loss of Instacash entirely.

10

72.     Internally, however, MoneyLion does not maintain any detailed tracker of what level of tipping is required to keep Instacash "free" or available to its users. Instead, the Company treats money obtained through tips as "an additional revenue stream" and closely tracks tipping rates (how often users tip) and tipping amounts (the dollar value of tips). Indeed, the Company publicly reports tips received as adding to its bottom-line revenue, not reducing its costs.

73.     One early business plan for Instacash was clear: the purpose of requesting tips from Instacash users was to extract funds that go "to MoneyLion as a payment (FEE)." Internally, the Company acknowledges that "Instacash profitability requires that we maximize profitability using both tip and fee-based structures." The goal is for MoneyLion "to raise [tipping] rates and keep them up by learning what works and continuously keeping the messaging and design on these screens fresh." Thus, MoneyLion employees "continue to work to ensure that both tipping rates" and "tip rates" are "at the optimum level that user base will support." The end goal is to get "users into our [Instacash] ecosystem and nurture them up the value chain" to produce revenue.

74.     To further drive revenue from tipping, MoneyLion closely tracks tipping rates. Early business plans noted that "about 65% of users provided an average tip of almost $5 for an average loan of about $50." And tipping has been quite profitable. As one MoneyLion analysis explained, even "a $5 tip on a $50 advance taken for a week is a great return at scale."

75.     To push users to pay tips when obtaining Paycheck Advances, MoneyLion engages in many of the same tactics it uses to push instant terms and disbursement. When an Instacash user requests a Paycheck Advance, in-app screens present suggested tip levels and require users to navigate to drop-down menus or other screens to remove the preselected tip.

76.     MoneyLion also predetermines a tip amount. At the outset of Instacash, this default tip was set at $5. The Company eventually adopted a dynamic tipping model that adjusts the

11

amount of the preselected tip based on the requested size of the Paycheck Advance. The amount of the preselected tip chosen by MoneyLion, however, is never $0.

77.     The Company refers internally to its predetermined tip amount as a "tip anchor"— a reference to cognitive biases wherein humans are readily tied to the first piece of information presented, thereby "anchoring" them to a starting point when making decisions. And MoneyLion ramps up effectiveness of its tip anchors by personalizing them for each user.

78.     MoneyLion also repeatedly demands tips, showing users screens during the normal process of requesting a Paycheck Advance through its app, after the terms of a proposed Paycheck Advances has been set, and even during future uses of Instacash. And the Company closely tracks user responses, including which screens they see and which buttons they push.

79.     For example, MoneyLion's analyses of its user base found that tipping rates and amounts tended to increase if users were shown future progressions in eligibility, such as access to future higher amounts of Paycheck Advances through Instacash. As one business plan stated: "We test everything" to optimize tipping, including headlines, colors, page load times, images, statements, the effect of email follow-up, and the messages conveyed.

80.     According to the Company's business plans, MoneyLion uses testing data to engage in "behavioral nudges and messaging" to push Instacash users to pay tips. The end goal is to "continue to improve economics of Instacash and make it highly profitable." Indeed, one business plan outlining the Company's "Instacash Goals and Roadmap" stated a goal of **_reducing_** the average Paycheck Advance obtained through Instacash down to $50 from $60 because "our tip rate as a % of principal" would be "higher." To accomplish this goal, MoneyLion planned to offer more consumers "the $25 tier" for Instacash, thereby limiting maximum Paycheck Advances to that amount, and deploy "other UX mechanics to encourage smaller amounts."

81.     As an example, when users successfully navigate the required menus to reset the tip amount to $0 during the process of obtaining Paycheck Advances through the app, MoneyLion will automatically show "friction screens" later in the Instacash process, prompting users again to provide tips in exchange for Paycheck Advances provided through Instacash, such as:



As this exemplar screenshot shows, MoneyLion pressures users repeatedly to tip when using Instacash by: (i) implicitly threatening them with loss of the product ("Instacash doesn't grow on trees"); (ii) inducing guilt for declining to tip ("Are you sure?"); (iii) anchoring users' expectations by recommending specific tip levels; and (iv) highlighting preferred tip amounts.

82.     Similarly, where users successfully avoid being pushed into tipping when obtaining prior Paycheck Advances, MoneyLion's app will automatically show them "retargeting screens" at the beginning of the process when they next use Instacash in the future, such as:

13



As this exemplar screenshot shows, through its retargeting screens MoneyLion similarly pressures users to tip for prior Paycheck Advances obtained through Instacash.

83.    The express purpose of these friction and retargeting screens, according to communications among employees, is to "improve instacash tipping rates."

84.    MoneyLion also evaluates the effectiveness of the screens it uses in its app to request that its users provide tips for using Instacash. In one experiment, the Company showed its users different images and headlines to evaluate which would "consistently produce the highest tipping metrics among users" before deploying updated screens through its app. MoneyLion also conducted experiments to determine whether presenting tips to Instacash users as dollar amounts or as percentages would drive more frequently and higher tipping.

85.    The result are screens like the one below, which pressures consumers to act on behalf of a claimed community interest and prominently displays a predetermined tip:

14



86.     As it does with TurboFees that users agree to pay to receive Paycheck Advances that have immediate terms, MoneyLion also incorporates "pre-filled" tip amounts determined by the Company into its One-Click process for obtaining Paycheck Advances:

Case 1:25-cv-04093    Document 1-1    Filed 05/15/25    Page 28 of 58



As this exemplar screenshot shows, MoneyLion's One-Click process encourages both fees for immediate terms and tips by preselecting amounts while drawing users' attention to the large, colored "Confirm" button and away from separate, grayed-out drop down menus.

87.    Despite no requirement to do so, Instacash users agreed to pay tips to MoneyLion in connection with nearly 40% of all Paycheck Advances obtained. For Instacash users who agreed to pay tips, they agreed to pay tips between $2.00 and $5.00 on more than three-quarters of all Paycheck Advances, and the average tip amount was about $4.10. In total, Instacash users agreed to pay more than $7 million in tips to MoneyLion, and the Company in fact was able to collect approximately $6.8 million from those same Instacash users during the Data Period.

88.    MoneyLion's tipping demands and manipulative behavioral tactics impose substantial costs of credit on Instacash users. During the Data Period, the most common Paycheck

Advance obtained by Instacash users was $100 to be repaid in two weeks, with the most common agreed-upon tip of $4. That $4 represents an APR of more than 100%.

### C.   MoneyLion Has Charged and Received Millions of Dollars in Interest through its High-Cost Paycheck Advances Made Through Instacash

89.     MoneyLion has extracted tens of millions of dollars from New Yorks' wages through Instacash. In total, during the Data Period, users agreed to pay approximately $25.6 million in fees and approximately $7.1 million in tips to MoneyLion for Paycheck Advances. The Company collected more than $31 million in fees and tips from New York consumers.

90.     During the Data Period, the most common amount of a Paycheck Advance was $50, the most common fee was $4.99, the most common tip was $2, and the most common term was ten days. Combining these most common traits to create a "typical" Paycheck Advance, the annualized cost of credit for this Paycheck Advance exceeds 350% APR.

91.     In total, users agreed to pay fees or tips to MoneyLion on about 4.25 million Paycheck Advances during the Data Period. The average cost of credit imposed by the Company's fees and tips was more than 800% APR, with more than 95% of these Paycheck Advances carrying APRs above 100% and more than half imposing costs in excess of 500% APR, as shown below:



17

92.     In total during the Data Period, MoneyLion made Paycheck Advances on which users agreed to pay costs in the form of fees and tips in amounts that exceeded 25% APR, New York's criminal usury cap, or 16%, new York's civil usury cap, about 4.1 million times.

93.     Even looking at fees alone, MoneyLion made Paycheck Advances during the Data Period on which users agreed to pay fees in amounts that exceeded the 16% APR or 25% APR civil and criminal state usury caps on nearly 4 million occasions.

94.     Similarly, looking at tips alone, MoneyLion made Paycheck Advances during the Data Period on which users agreed to pay tips in amounts that exceeded the 16% APR or 25% APR civil and criminal state usury caps on approximately 1.67 million occasions.

95.     Despite users' agreements to pay fees and tips, MoneyLion states that users paid "0% APR" when they obtained Paycheck Advances in disclosures such as the following:



18

96.     While MoneyLion does not disclose to Instacash users that it treats these fees and tips as supplemental revenue rather than costs for services provided, the Company's publicly filed financials acknowledge this reality. Specifically, MoneyLion reports both Instacash fees and Instacash tips as gross revenue, without accounting for any costs being covered by those fees or tips. As the Company acknowledges in its financials, the services it provides related to these tips and fees "are not distinct from the services of the Instacash advance."

### D.     MoneyLion Has Employed Artificial (and Generally Undisclosed) Per-Transaction Limits to Extract Millions of Additional Dollars in Interest

97.     At Instacash's inception, the total amount MoneyLion would make available to an Instacash user was $250. The Company subsequently increased this limit to $500.

98.     MoneyLion's advertising generally focuses on the total amount of funds that the Company makes available. In one advertisement, for example, MoneyLion prominently declared: "GET CASH ADVANCES UP TO $250 WITH NO INTEREST." And the Company's website on which that ad appeared contained the following Instacash explainer:

**Instacash makes it easy
to get the cash you need:**

1.  Download the MoneyLion app and use your email address to create an account.

2.  Link an account you'd like to use to receive your cash advances. No credit check.

3.  Unlock Instacash and get paid today. Tap "Instacash" and request an amount up to $250.

99.     Similarly, the front page of MoneyLion's website prominently proclaims that consumers can get "a cash advance of up to $500," as shown below:

19



100.    MoneyLion's representation in its advertisement on its website is that a future user can obtain "a cash advance"—meaning one transaction—of up to $500. In other advertisements, MoneyLion shows screenshots of phones purporting to reflect its app in which a "Balance" of "$500 available out of $500" is shown above a green "Request" button, also with no indication that, when a user actually uses the app, a $500 Paycheck Advance will not be available.

101.    Contrary to this representation, MoneyLion placed a $50 per-transaction limit on Instacash at inception, limiting users to Paycheck Advances of $50. In late 2021, around the same time that the Company increased total amounts available in Instacash from $250 to $500, MoneyLion increased this limit to $100 for any single Paycheck Advance.

102.    As a result of the per-transaction limit, users who want to access the entire amount of funds made available through Instacash must obtain multiple Paycheck Advances—and pay multiple fees and tips if the users desired immediate loan terms and disbursement. Indeed, the Company internally projected as much: "The increase from $50 to $75 forces users to take at least 2 instacashes to get the full $75, hence we see an increase in % fee promised." Yet MoneyLion's advertising of the $250 and $500 amounts available make no mention of these caps.

Case 1:25-cv-04093    Document 1-1    Filed 05/15/25    Page 33 of 58

103.    Despite its successful extraction efforts, MoneyLion favorably contrasts itself with payday lenders. In an online explainer, the Company describes the following: "Suppose the lender is offering $250 payday loans and charging $15 for every $100 borrowed, this means you'll spend $37.50 on interest alone – that comes out to 400% APR!" Yet if MoneyLion offered a consumer $250 through Instacash, due to the Company's artificial transaction limit that Instacash user would need to take five $50 Paycheck Advances, paying a $4.99 fee each time for instant terms and instant disbursement, to obtain the $250 on the same terms as the Company's hypothetical payday lender—**nearly $25 and an APR of 260%**. And if that user provided the $3 tip that MoneyLion aggressively pushes for each Paycheck Advance, the user would end up paying nearly $40 to obtain the $250—an APR of 415% and **more than to the hypothetical payday lender**.

104.    Instacash users regularly incurred substantial additional fees and tips to access their full available balance. During the Data Period, nearly two million Paycheck Advances were by Instacash users who had previously obtained a Paycheck Advance minutes earlier. And Instacash users who engaged in these consecutive transactions paid millions of dollars in fees and tips on the subsequent Paycheck Advances as a result of MoneyLion's artificial transaction limits.

## V.    INSTACASH TRAPS CONSUMERS IN CYCLES OF DEPENDENCY THAT MONEYLION ACTIVELY BOOSTS TO ENCOURAGE REPEAT BORROWING

105.    For Instacash to reliably generate profits for MoneyLion, the Company needs users to obtain Paycheck Advances regularly and repeatedly. MoneyLion cannot profit from Instacash if each Instacash user obtains one monthly Paycheck Advance to cover a single expense.

106.    MoneyLion's Instacash, however, readily drives usage: As users obtain multiple Paycheck Advances and the Company debits substantial sums from RoarMoney accounts or external bank accounts after new direct deposits to repay itself and capture fees and tips, the funds

available for users to cover ongoing expenses is reduced. As a result, users need to quickly obtain additional Paycheck Advances to cover the shortfall, creating a cycle of dependency.

107.    MoneyLion recognized the addictive nature of Instacash early on. Early business plans for expanding the Company's offering of Paycheck Advances to users without RoarMoney accounts observed that "2 out of 3 eligible customers have used Instacash. And 2 out of 3 users who have used Instacash have returned and used the product at least a second time."

108.    And indeed, the average number of times Instacash users obtain Paycheck Advances each week has steadily risen over time, as shown below:



109.    According to a February 2023 modeling exercise, MoneyLion estimates that up to 40% of Instacash users pay fees to the Company for 10 or more Paycheck Advances per month, up to 7% of users pay fees on 20 or more Paycheck Advances per month, and nearly one out of every 100 users pay fees on 30 or more Paycheck Advances per month.

110.    The key for MoneyLion to make Instacash profitable is to push as many users as it can into these higher-usage categories. In fact, during the Data Period, more than 44% of the

Case 1:25-cv-04093 Document 1-1 Filed 05/15/25 Page 35 of 58

Company's fees and tips were extracted from users who obtained two or more Paycheck Advances weekly. And the burdens of fees and tips fall heavier on higher-usage users. For example, users who obtain Paycheck Advances every other day or more on average—which make up one out of every five Instacash users—regularly incur fees and pay tips in excess of $57 each month. And this user group collectively generates about half of all Instacash fees and tips:



111. Users who become dependent on Instacash need to obtain Paycheck Advances more and more often to make up the resulting shortfalls once repayment and fees and tips are extracted from their direct deposits. Across the Data Period, approximately 44% of all Paycheck Advances obtained through Instacash were for users who previously obtained a Paycheck Advances two days earlier or less. And these users paid a median APR of more than 365%.

112. The effect on Instacash users' financial wellbeing is straightforward. A user who anticipates receiving a $1,000 direct deposit for work every two weeks and who obtains a median-level Paycheck Advance twice weekly—$50 plus a $4.99 fee and $2 tip—will have nearly $250 extracted by MoneyLion from her next $1,000 direct deposit, leaving her hundreds of dollars short

when managing large-dollar recurring expenses such as the mortgage or rent and car payment. And higher-usage Instacash users can easily see their $1,000 direct deposits cut in half.

113.    Similarly, the costs imposed by Instacash are disproportionate to any benefit received. A user who takes one $50 Paycheck Advance for a $4.99 fee receives $50 immediately and then receives $54.99 less on pay day. During the next pay cycle, the user requests a $54.99 Paycheck Advance to make up for lost funds. But this new Paycheck Advance is not providing new funds—it is filling a hole left by the prior Paycheck Advance. And the fee incurred for this and each subsequent Paycheck Advance, which can amount to $100 or more over time, is solely attributable to the one-time benefit received from the first Paycheck Advance alone.

114.    In recent years, MoneyLion has supercharged Instacash usage further through "Boost" programs, in which users gain temporary increases to the total funds available through Instacash, thereby allowing maxed-out users to obtain additional Paycheck Advances.

115.    For example, the Company sent users the following boost in March 2021:



116.    MoneyLion regularly sends boosts to members on holidays or- in anticipation of future short-term spending. In one case, MoneyLion sent boosts for Valentine's Day:



MoneyLion has sent boosts in advance of Thanksgiving, on the Super Bowl, after Valentine's Day, and throughout the winter holidays. The Company even sends boosts on birthdays.

117.    MoneyLion also offers boosts of up to $50 to the amount of Paycheck Advances available to Instacash users who successfully refer new users to the product.

118.    MoneyLion's projections of the effects of its boosts programs show that boosts increase overall Instacash usage—and the fees and tips that accompany that usage—by approximately 25%. The effect is so reliable that the Company previously has rolled out new boosts on short notice in response to weaker-than-expected Instacash performance.

119.    MoneyLion also has launched a "Peer Boost" program through which certain users identified by the Company receive the ability to send $5 boosts directly to other users, increasing the amount of funds available to those users through Instacash. Instacash users who receive these

25

Case 1:25-cv-04093    Document 1-1    Filed 05/15/25    Page 38 of 58

boosts then in turn are granted five $5 boosts they can send to other users. Each month, users' available boosts reset, and the process of increasing Instacash limits begins again.

120.    MoneyLion's founder touted Peer Boosts to employees as "F'ing brilliant," instructing employees to work to "make this viral" and highlight it "on social media."

121.    It worked. MoneyLion's Peer Boost program spawned an entire community of addicted users who regularly seek out boosts from other Instacash users in exchange for boosts back, further driving Instacash usage and generating fee and tip revenue for the Company:





26

Posts from Instacash users desperate for their next Instacash fix through the Company's Peer Boost program go on for pages and pages across various online forums such as Reddit.

122.    MoneyLion encourages this behavior by prompting its users who receive boosts from other Instacash users to "Return the boost" and providing a link to do so immediately:



123.    MoneyLion also created its own online forum, called the "Discover Feed," where Instacash users looking to exchange boosts could be connected, a practice the Company expressly encouraged with its "Give $5 Boost. Get $5 Boost." campaign.

124.    Finally, MoneyLion accelerates Peer Boost usage by periodically increasing the total volume of boosts that eligible users can send, such as this doubling of available boosts:



125.    As a result, MoneyLion is steadily growing Instacash-dependent users. Since inception, both the absolute number of users who obtain Paycheck Advances more than every-other-day, and the percentage of such users who make up users, has steadily grown:





126.    Similarly, MoneyLion generates nearly half of all tip and fee revenue from new Paycheck Advances that users request within two or fewer days of their last ones.

28

127.    The financial behavior MoneyLion's lending model encourages is unsustainable. For the ten percent of Instacash users with the highest average frequency of Paycheck Advances during the Data Period, the median size of their Paycheck Advances was $90, the median fee of the Paycheck Advances these users obtained was $5.99, and the median term was 10 days. Through this financial activity, these users are effectively taking out a new, 242% APR loan every other day, as MoneyLion extracts hundreds of dollars from these users annually.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Executive Law § 63(12) (Illegality)
### (Civil Usury)

128.    Plaintiff repeats and realleges the allegations in paragraphs 1 to 127 above.

129.    New York's Executive Law § 63(12) authorizes Plaintiff to seek injunctive and other equitable relief when any individual or business engages in repeated and persistent illegal conduct in the carrying on, conducting, or transaction of business in the state of New York.

130.    New York's General Obligations Law § 5-501 prohibits any entity from directly or indirectly charging, taking, or receiving any money as interest on a loan at a rate exceeding sixteen percent (16%) annually, as set by New York's Banking Law § 14-A.

131.    MoneyLion has made millions of Paycheck Advances to New York users over the past several years. These Paycheck Advances are loans: The Company and its users have entered into agreements that govern the Paycheck Advances, MoneyLion has sent funds to users who requested Paycheck Advances through Instacash, and users have agreed to repay the Company by authorizing MoneyLion to debit RoarMoney accounts or external bank accounts.

132.    MoneyLion also has, directly or indirectly, charged, taken, or received interest on these Paycheck Advances. The Company has charged and taken interest in the form of fees it has

charged and collected for Paycheck Advances whose terms begin immediately. The Company also has taken and received interest in the form of tips it has received from Instacash users.

133.    As a result of these practices, MoneyLion has made millions of Paycheck Advances to New York users of Instacash for which the Company has, directly or indirectly, charged, taken, or received interest at rates that exceed an annualized cost of sixteen percent (16%).

134.    By reason of the conduct alleged herein, Defendant has engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

**SECOND CAUSE OF ACTION**
**Executive Law § 63(12) (Illegality)**
**(Criminal Usury)**

135.    Plaintiff repeats and realleges the allegations in paragraphs 1 to 127 above.

136.    New York's Executive Law § 63(12) authorizes Plaintiff to seek injunctive and other equitable relief when any individual or business engages in repeated and persistent illegal conduct in the carrying on, conducting, or transaction of business in the state of New York.

137.    New York's Penal Law § 190.40 makes it a Class E felony for any entity to take or receiving money as interest on a loan at a rate exceeding twenty-five percent (25%) annually.

138.    MoneyLion has made millions of Paycheck Advances to New York users over the past several years. These Paycheck Advances are loans: The Company and its users have entered into agreements that govern the Paycheck Advances, MoneyLion has sent funds to users who requested Paycheck Advances through Instacash, and users have agreed to repay the Company by authorizing MoneyLion to debit RoarMoney accounts or external bank accounts.

139.    MoneyLion also has, directly or indirectly, charged, taken, or received interest on these Paycheck Advances. The Company has charged and taken interest in the form of fees it has charged and collected for Paycheck Advances whose terms begin immediately. The Company also has taken and received interest in the form of tips it has received from Instacash users.

30

140.     As a result of these practices, MoneyLion has made millions of Paycheck Advances to New York users of Instacash for which the Company has, directly or indirectly, charged, taken, or received interest at rates that exceed an annualized cost of twenty-five percent (25%).

141.     By reason of the conduct alleged herein, Defendant has engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

### THIRD CAUSE OF ACTION
### Executive Law § 63(12) (Fraud)

142.     Plaintiff repeats and realleges the allegations in paragraphs 1 to 127 above.

143.     New York's Executive Law § 63(12) authorizes Plaintiff to seek injunctive and other equitable relief when any individual or business engages in repeated and persistent fraud in the carrying on, conducting, or transaction of business in the state of New York.

144.     MoneyLion has engaged in fraud in connection with its Instacash product offered to New York consumers in at least the following respects:

a.      having falsely represented to consumers in marketing materials and users in disclosures that the Company's Paycheck Advances carry 0% APRs or no interest;

b.      having misleadingly marketed that consumers can obtain funds immediately through Instacash without incurring costs or interest;

c.      having deceptively marketed Instacash as providing access to immediate funds in amounts, such as $250 or $500, that are greater than the amount of funds, such as $50 or $100, that the Company has permitted users to obtain in a single Paycheck Advance; and

d.      having described tips as voluntary while engaging in manipulation and scare tactics to force users to agree to tip when obtaining Paycheck Advances.

145.     By reason of the conduct alleged herein, Defendant has engaged in repeated and persistent fraud in violation of Executive Law § 63(12).

## FOURTH CAUSE OF ACTION
### Executive Law § 63(12) (Illegality)
### (GBL § 349)

146.    Plaintiff repeats and realleges the allegations in paragraphs 1 to 127 above.

147.    New York's Executive Law § 63(12) authorizes Plaintiff to seek injunctive and other equitable relief when any individual or business engages in repeated and persistent illegal conduct in the carrying on, conducting, or transaction of business in the state of New York.

148.    New York's GBL prohibits deceptive acts and practices in the conduct of any business, trade, or commerce in the state of New York.  GBL § 349(a).

149.    MoneyLion has engaged in deceptive practices in connection with its Instacash product offered to New York consumers in at least the following respects:

        a.    having falsely represented to consumers in marketing materials and users in disclosures that the Company's Paycheck Advances carry 0% APRs or no interest;

        b.    having created inaccurate impressions that consumers can obtain funds immediately through Instacash without incurring costs or interest;

        c.    having deceptively marketed Instacash as providing access to immediate funds in amounts, such as $250 or $500, that are greater than the amount of funds, such as $50 or $100, that the Company has permitted users to obtain in a single Paycheck Advance; and

        d.    having described tips as voluntary while engaging in manipulation and scare tactics to force users to agree to tip when obtaining Paycheck Advances.

150.    By reason of the conduct alleged herein, Defendant has engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## FIFTH CAUSE OF ACTION
### Executive Law § 63(12) (Illegality)
### (GBL § 350)

151.    Plaintiff repeats and realleges the allegations in paragraphs 1 to 127 above.

32

152.    New York's Executive Law § 63(12) authorizes Plaintiff to seek injunctive and other equitable relief when any individual or business engages in repeated and persistent illegal conduct in the carrying on, conducting, or transaction of business in the state of New York.

153.    New York's GBL prohibits false advertising in the conduct of any business, trade, or commerce, or furnishing of any service, in the state of New York. GBL § 350.

154.    MoneyLion has engaged in false advertising in connection with its Instacash product offered to New York consumers in at least the following respects:

a.    having falsely represented in marketing materials and other disclosures that the Company's Paycheck Advances carry 0% APRs or no interest; and

b.    having falsely represented in marketing materials access to immediate funds in amounts, such as $250 or $500, that are greater than the amount of funds, such as $50 or $100, that the Company has permitted users to obtain in a single Paycheck Advance.

155.    By reason of the conduct alleged herein, Defendant has engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

**SIXTH CAUSE OF ACTION**
**Executive Law § 63(12) (Illegality)**
**(12 U.S.C. § 5531 (Deceptive Acts or Practices))**

156.    Plaintiff repeats and realleges the allegations in paragraphs 1 to 127 above.

157.    New York's Executive Law § 63(12) authorizes Plaintiff to seek injunctive and other equitable relief when any individual or business engages in repeated and persistent illegal conduct in the carrying on, conducting, or transaction of business in the state of New York.

158.    The CFPA is a federal consumer law that prohibits covered persons or service providers from committing or engaging in a deceptive, unfair, or abusive act or practice under federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. § 5531(a).

33

159.    An act or practice is deceptive if it involves a material misrepresentation or omission likely to mislead consumers acting reasonably under the circumstances. Information is material to consumers if it is likely to affect a consumer's conduct regarding the product.

160.    MoneyLion is offering a "consumer financial product or service" and the Company is therefore a "covered person" within the meaning of the CFPA. 12 U.S.C. § 5481(5)–(6).

161.    MoneyLion has engaged in deceptive practices in connection with its Instacash product offered to New York consumers in at least the following respects:

a.    having falsely represented to consumers in marketing materials and users in disclosures that the Company's Paycheck Advances carry 0% APRs or no interest;

b.    having created inaccurate impressions that consumers can obtain funds immediately through Instacash without incurring costs or interest;

c.    having deceptively marketed Instacash as providing access to immediate funds in amounts, such as $250 or $500, that are greater than the amount of funds, such as $50 or $100, that the Company has permitted users to obtain in a single Paycheck Advance; and

d.    having described tips as voluntary while engaging in manipulation and scare tactics to force users to agree to tip when obtaining Paycheck Advances.

162.    By reason of the conduct alleged herein, Defendant has engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## SEVENTH CAUSE OF ACTION
### Executive Law § 63(12) (Illegality)
### (12 U.S.C. § 5531 (Abusive Acts or Practices))

163.    Plaintiff repeats and realleges the allegations in paragraphs 1 to 127 above.

164.    New York's Executive Law § 63(12) authorizes Plaintiff to seek injunctive and other equitable relief when any individual or business engages in repeated and persistent illegal conduct in the carrying on, conducting, or transaction of business in the state of New York.

34

165.     The CFPA is a federal consumer law that prohibits covered persons or service providers from committing or engaging in a deceptive, unfair, or abusive act or practice under federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. § 5531(a).

166.     An act or practice is abusive if it "materially interferes with the ability of a consumer to understand a term or condition" of a consumer financial product, or if it "takes unreasonable advantage" of "the inability of a consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." 12 U.S.C. §§ 5531(d)(2).

167.     MoneyLion is offering a "consumer financial product or service" and the Company is therefore a "covered person" within the meaning of the CFPA. 12 U.S.C. § 5481(5)–(6).

168.     The consequential terms of a financial transaction, such as pricing and costs, are central to consumers' decisions of whether to enter into such transactions.

169.     MoneyLion has materially interfered with consumers' ability to understand the true pricing and costs of its Paycheck Advances in at least two distinct ways:

a.     MoneyLion has marketed and offered "no interest" or "0% APR" Paycheck Advances to New York consumers when the Company charges fees for Paycheck Advances that have terms that begin immediately and manipulates Instacash users into paying tips in connection with their receipt of Paycheck Advances. Further, by declining to disclose fees and tips associated with Paycheck Advances as annualized costs or APRs, the Company has obscured relative costs of its Paycheck Advances as compared to alternative forms of consumer credit.

b.     MoneyLion has promised New York consumers' immediate access to $250 or $500, depending on the time period, while maintaining undisclosed caps of $50 or $100 for any single Paycheck Advance that force consumers to incur multiple fees to obtain full funds.

170.    MoneyLion separately has taken unreasonable advantage of consumers' inability to protect themselves through rampant manipulation. The Company has employed multiple techniques to push users to select fee-based Paycheck Advances with immediate terms and has made it more difficult to avoid more costly Paycheck Advances. Similarly, the Company has used techniques—including anchors that tie users to certain tipping expectations, friction and retargeting screens designed to manipulate users, dynamically preselected tips, and guilt- and fear-inducing messages—to push its users to tip the Company when using Instacash.

171.    MoneyLion takes unfair advantage of consumers' inability to protect themselves by extracting tips are usurious rates that the Company treats as a source of revenue.

172.    Instacash users also are unable to protect themselves from the financial need created by taking a Paycheck Advance, which places consumers in a position of needing a new advance after their next pay day in order to fill the gap in their finances that the first one created.

173.    MoneyLion has taken unreasonable advantage of these circumstances by encouraging repeat and regular Instacash, including use through its One-Click process, by sending regular "boosts" to encourage users to obtain additional Paycheck Advances, thereby putting themselves further behind, and by enabling and encouraging Peer Boosts. The Company, meanwhile, has made itself indifferent to the resulting financial strain by being first in line to new deposits that comes into consumers' RoarMoney or external bank accounts.

174.    Finally, MoneyLion has relentlessly tweaked its business model to ensure that it can predict users' future direct deposits down to the minute, has required users to authorize the Company to attempt repeat debits over multiple days, has implemented artificial time periods for users' to cancel debit authorizations provided when obtaining Paycheck Advances, and, in the case of RoarMoney account holders, has systematically prioritized Instacash repayments over other

36

payment obligations from RoarMoney accounts. Through these actions, MoneyLion has taken unreasonable advantage of consumers' inability to protect themselves from harm by prioritizing critical expenses, such as rent, food, and medical expenses, over Instacash repayment.

175.    By reason of the conduct alleged herein, Defendant has engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court issued an order and judgment under Executive Law § 63(12) and GBL §§ 349 and 350:

a.    permanently enjoining Defendant, its agents, trustees, employees, successors, heirs, and assigns; and any other person under their direction or control, whether acting individually or in concert with others, or through any corporate or other entity or device through which one or more of them may now or hereafter act or conduct business, from engaging in the fraudulent and illegal practices alleged herein;

b.    ordering Defendant to provide an accounting of all consumers who obtained loans through Defendant's Instacash product in the preceding six years;

c.    ordering Defendant to pay restitution and damages to all injured consumers, whether known or unknown, at the time of the decision and order;

d.    ordering Defendant to disgorge all profits from the fraudulent and illegal practices alleged herein;

e.    directing Defendant, under GBL § 350-d, to pay a civil penalty of $5,000 to the State of New York for each violation of GBL § 349;

f.    imposing appropriate civil money penalties against Defendant as authorized by 12 U.S.C. § 5565(c);

g.    awarding costs under CPLR 8303(a)(6) and 12 U.S.C. § 5565(c); and

h.    granting such other and further relief as the Court deems just and proper.

Dated: April 14, 2025

Respectfully submitted,

LETITIA JAMES
Attorney General of the State of New York


By: _____
Christopher L. Filburn
*Assistant Attorney General*
Bureau of Consumer Frauds & Protection
28 Liberty Street, 20th Floor
New York, New York 10005
Tel.: 212.416.8303
Email: christopher.filburn@ag.ny.gov

Of counsel:

Jane M. Azia
*Bureau Chief*

Laura J. Levine
*Deputy Bureau Chief*

*Counsel for Plaintiff People*
*of the State of New York*

38

Case 1:25-cv-04093    Document 1-1    Filed 05/15/25    Page 51 of 58



STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL

LETITIA JAMES
ATTORNEY GENERAL

DIVISION OF ECONOMIC JUSTICE
CONSUMER FRAUDS & PROTECTION BUREAU

## NO-FEE AUTHORIZATION LETTER

April 14, 2025

**<u>BY NYSCEF</u>**
Clerk of the Court
Supreme Court, New York County
60 Centre Street
New York, NY 10007

*People of the State of New York v. MoneyLion Inc.*

Dear Clerk of the Court:

Please waive collection of fees for the New York State Office of the Attorney General in connection with the above-captioned action. The Office is exempt from the payment of fees under New York Executive Law § 161(2) and CPLR 8017.

Respectfully Submitted,

LETITIA JAMES
Attorney General of the State of New York

By: _____
Christopher L. Filburn
Assistant Attorney General
Bureau of Consumer Frauds and Protection
christopher.filburn@ag.ny.gov
212.416.8303

Case 1:25-cv-04093    Document 1-1    Filed 05/15/25    Page 52 of 58

UCS-840
(rev. 12/16/2024)

# REQUEST FOR JUDICIAL INTERVENTION

## Supreme COURT, COUNTY OF New York

Index No: _____    Date Index Issued: _____

| | **For Court Use Only:** |
|---|---|

**IAS Entry Date**

| CAPTION | Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet. |
|---|---|

People of the State of New York, by Letitia James, Attorney General of the State of New York

Plaintiff(s)/Petitioner(s)

**Judge Assigned**

-against-

MoneyLion Inc.

**RJI Filed Date**

Defendant(s)/Respondent(s)

## NATURE OF ACTION OR PROCEEDING:    Check only one box and specify where indicated.

### COMMERCIAL
- ☐ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ☐ Contract
- ☐ Insurance (where insurance company is a party, except arbitration)
- ☐ UCC (includes sales and negotiable instruments)
- ☒ Other Commercial (specify):  Usurious Lending

**NOTE:** For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the **COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C)**.

### TORTS
- ☐ Asbestos
- ☐ Environmental (specify): _____
- ☐ Medical, Dental or Podiatric Malpractice
- ☐ Motor Vehicle
- ☐ Products Liability (specify): _____
- ☐ Other Negligence (specify): _____
- ☐ Other Professional Malpractice (specify): _____
- ☐ Other Tort (specify): _____

### SPECIAL PROCEEDINGS
- ☐ Child-Parent Security Act (specify): ☐ Assisted Reproduction ☐ Surrogacy Agreement
- ☐ CPLR Article 75 - Arbitration    [see **NOTE** in **COMMERCIAL** section]
- ☐ CPLR Article 78 - Proceeding against a Body or Officer
- ☐ Election Law
- ☐ Extreme Risk Protection Order
- ☐ MHL Article 9.60 - Kendra's Law
- ☐ MHL Article 10 - Sex Offender Confinement (specify):    ☐ Initial    ☐ Review
- ☐ MHL Article 81 (Guardianship)
- ☐ Other Mental Hygiene (specify): _____
- ☐ Other Special Proceeding (specify): _____

### MATRIMONIAL
- ☐ Contested
  **NOTE:** If there are children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum (UCS-840M)**.

  For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (**UD-13**).

### REAL PROPERTY    Specify how many properties the application includes: _____
- ☐ Condemnation
- ☐ Mortgage Foreclosure (specify):    ☐ Residential    ☐ Commercial
  Property Address: _____

  **NOTE:** For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the **FORECLOSURE RJI ADDENDUM (UCS-840F)**.
- ☐ Partition
  **NOTE:** Complete and attach the **PARTITION RJI ADDENDUM (UCS-840P)**.
- ☐ Tax Certiorari (specify):    Section: _____ Block: _____ Lot: _____
- ☐ Tax Foreclosure
- ☐ Other Real Property (specify): _____

### OTHER MATTERS
- ☐ Certificate of Incorporation/Dissolution    [see **NOTE** in **COMMERCIAL** section]
- ☐ Emergency Medical Treatment
- ☐ Habeas Corpus
- ☐ Local Court Appeal
- ☐ Mechanic's Lien
- ☐ Name Change/Sex Designation Change
- ☐ Pistol Permit Revocation Hearing
- ☐ Sale or Finance of Religious/Not-for-Profit Property
- ☐ Other (specify): _____

## STATUS OF ACTION OR PROCEEDING    Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ☐ | ☒ | If yes, date filed: _____ |
| Has a summons and complaint or summons with notice been served? | ☐ | ☒ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ☐ | ☒ | If yes, judgment date: _____ |

## NATURE OF JUDICIAL INTERVENTION    Check one box only and enter additional information where indicated.

- ☐ Infant's Compromise
- ☐ Extreme Risk Protection Order Application
- ☐ Note of Issue/Certificate of Readiness
- ☐ Notice of Medical, Dental or Podiatric Malpractice    Date Issue Joined: _____
- ☐ Notice of Motion    Relief Requested: _____    Return Date: _____
- ☐ Notice of Petition    Relief Requested: _____    Return Date: _____
- ☐ Order to Show Cause    Relief Requested: _____    Return Date: _____
- ☐ Other Ex Parte Application    Relief Requested: _____
- ☐ Partition Settlement Conference
- ☐ Request for Preliminary Conference
- ☐ Residential Mortgage Foreclosure Settlement Conference
- ☐ Waiver of Court Costs, Fees and Expenses
- ☐ Writ of Habeas Corpus
- ☒ Other (specify):  Assignment to Commercial Division; Waiver of Fees

| RELATED CASES | List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | | |
|---|---|---|---|---|
| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| PARTIES | | For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | |
|---|---|---|---|---|
| Un-Rep | Parties<br><br>List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants<br><br>For represented parties, provide attorney's name, firm name, address, phone and email.  For unrepresented parties, provide party's address, phone and email. | Issue Joined<br><br>For each defendant, indicate if issue has been joined. | Insurance Carriers<br><br>For each defendant, indicate insurance carrier, if applicable. |
| ☐ | Name: People of the State of New York, by Letitia James, Attorney Ge...<br><br>Role(s): Plaintiff/Petitioner | CHRISTOPHER FILBURN, OFFICE OF THE ATTORNEY GENERAL, BUREAU OF CONSUMER FRAUDS & PROTECTION, 28 LIBERTY ST FL 20 , NEW YORK, NY 10005, christopher.filburn@ag.ny.gov | ☐ YES  ☒ NO | |
| ☐ | Name: MoneyLion Inc.<br><br>Role(s): Defendant/Respondent | James Kim, Troutman Pepper Locke LLP, 200 Vesey St., 20th Floor, New York, NY  10281 | ☐ YES  ☒ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER  RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated:  04/14/2025

CHRISTOPHER LEE FILBURN
Signature

4819850
Attorney Registration Number

CHRISTOPHER LEE FILBURN
Print Name

# Request for Judicial Intervention Addendum

UCS-840A (7/2012)

Supreme COURT, COUNTY OF New York

**Index No:**

**For use when additional space is needed to provide party or related case information.**

**PARTIES:**    For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties<br><br>List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants<br><br>For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | Issue Joined<br><br>For each defendant, indicate if issue has been joined. | Insurance Carriers<br><br>For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: People of the State of New York, by Letitia James, Attorney General of the State of New York<br><br>Role(s): Plaintiff/Petitioner | CHRISTOPHER FILBURN, OFFICE OF THE ATTORNEY GENERAL, BUREAU OF CONSUMER FRAUDS & PROTECTION, 28 LIBERTY ST FL 20 , NEW YORK, NY 10005, christopher.filburn@ag.ny.gov | ☐ YES  ☒ NO | |

**RELATED CASES:**    List any related actions. For Matrimonial actions, include any related criminal and/or Famiy Court cases.

## New York State Unified Court System

[nycourts.gov](nycourts.gov)

# Request for Judicial Intervention Commercial Division Addendum

**UCS-840C** (01/2024)
Page **1** of **3**
[nycourthelp.gov](nycourthelp.gov)

## Supreme Court
## County of New York

**Plaintiff/Petitioner** (persons/entities that started the case):

People of the State of New York, by Letitia James, Attorney General of the State …

**Index #:**

_____

**Defendant/Respondent** (persons/entities the case is against):

MoneyLion Inc.

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

☒ Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g., unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g., sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; technology transactions and/or commercial disputes involving or arising out of technology; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)

☐ Transactions governed by the Uniform Commercial Code, excluding those concerning individual cooperative or condominium units

☐ Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only

☐ Shareholder derivative actions (without consideration of the monetary threshold)

☐ Commercial class actions (without consideration of the monetary threshold)

☐ Business transactions involving or arising out of dealings with commercial banks and other financial institutions

☐ Internal affairs of business organizations

☐ Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters

☐ Environmental insurance coverage

☐ Commercial insurance coverage (e.g., directors and officers, errors and omissions, and business interruption coverage)

☐ Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures (without consideration of the monetary threshold)

☐ Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues (where the applicable agreement provides for the arbitration to be heard outside the United States, the monetary threshold set forth in 22 NYCRR 202.70(a) shall not apply)

 **ADA Accommodations**
[ada@nycourts.gov](ada@nycourts.gov)

 **Spoken or Sign Language Interpreters**
[interpreter@nycourts.gov](interpreter@nycourts.gov)

**COURT Help** **1-800-COURT-NY**
**(268-7869)**

1 of 3

FILED: NEW YORK COUNTY CLERK 04/14/2025 11:14 AM
NYSCEF DOC. NO. 6

**UCS-840C** (01/2024)          Page **2** of **3**     **Index #:**

Plaintiff/Petitioner's claim for compensatory damages, exluding punitive damages, interest, costs and counsel fees claimed:  $31000000.00

Plaintiff/Petitioner's claim for equitable or declaratory relief [brief description]:
 Civil and criminal usury, deceptive and fraudulent business practices, false advertising, and abusive acts or practices

Defendant/Respondent's counterclaims, including claims for monetary relief [brief description]:

I request that this case is assigned to the Commercial Division. I certify that the case meets the Commercial Division's jurisdictional requirements as set forth in 22 NYCRR 202.70(a), (b) and (c).

 Dated:  04/14/2025                    <u>CHRISTOPHER LEE FILBURN</u>
                                          Signature

                                       <u>CHRISTOPHER LEE FILBURN</u>
                                          Print Name

**Caption Rider Sheet**

People of the State of New York, by Letitia James, Attorney General of the State of New York

**Plaintiff(s)/Petitioner(s)**

**vs.**

**Defendant(s)/Respondent(s)**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

PEOPLE OF THE STATE OF NEW YORK,
by LETITIA JAMES, Attorney General of the State of
New York,

                         Plaintiff,

       - against -

MONEYLION INC.,

                        Defendant.

**AFFIRMATION OF
SERVICE**

Index No. 451303/2025

---

       CHRISTOPHER L. FILBURN, an attorney duly admitted to practice before the courts of

the State of New York, affirms the following under penalty of perjury:

       I am an Assistant Attorney General in the New York State Office of the Attorney General,

I am over eighteen years of age, and I am not a party to this action. On April 15, 2025, James Kim

of Troutman Pepper Locke LLP, counsel for Defendant, confirmed by email that his firm was

authorized to accept service by email on behalf of Defendant in this action. That same day, I served

true and correct copies of the following documents by email to Mr. Kim and his firm: Summons;

Complaint; No-Fee Letter; Request for Judicial Intervention; Commercial Division Addendum and

a Notice of Electronic Filing. Mr. Kim replied by email later that day to confirm receipt of service.

Dated: April 16, 2025
       New York, New York

                       By: _____
                       Christopher L. Filburn
                       *Assistant Attorney General*
                       Bureau of Consumer Frauds & Protection
                       28 Liberty Street, 20th Floor
                       New York, New York 10005
                       Tel.: 212.416.8303
                       Email: christopher.filburn@ag.ny.gov