UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------  X

PEOPLE OF THE STATE OF NEW YORK
by LETITIA JAMES, Attorney General of the
State of New York,

                                Plaintiff,

                      v.

MONEYLION INC., MONEYLION
TECHNOLOGIES INC. and ML PLUS LLC,

                      Defendants.

-------------------------------------------------------  X

Case No. 1:25-cv-04093-CM

# DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...........................................................................................................................1

BACKGROUND .............................................................................................................................2

      A.      MoneyLion's Instacash Product ...............................................................................2

      B.      The State's Complaint ..............................................................................................4

ARGUMENT ...................................................................................................................................6

I.      REMOVAL WAS PROPER BECAUSE THE STATE PLEADS CLAIMS THAT ARE
      CREATED BY FEDERAL LAW ......................................................................................7

      A.      The Sixth and Seventh Causes of Action Assert Federal Rights and Seek Federal
              Remedies.................................................................................................................7

      B.      The State's Citation of Executive Law § 63(12) Does Not Alter the Analysis ...........9

II.     REMOVAL WAS PROPER BECAUSE THE STATE'S CLAIMS RAISE A DISPUTED
      AND SUBSTANTIAL FEDERAL ISSUE ......................................................................11

      A.      The State's Claims Necessarily Raise a Federal Issue ...............................................12

      B.      The Federal Issue Implicated Is Actually Disputed...................................................13

      C.      The Federal Issue Is Substantial ...............................................................................15

      D.      The Federal Issue Is Properly Adjudicated in Federal Court ....................................19

CONCLUSION...............................................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barone v. Bausch & Lomb, Inc.*,
    372 F. Supp. 3d 141 (W.D.N.Y. 2019) ...................................................................14

*Broder v. Cablevision Systems Corp.*,
    418 F.3d 187 (2d Cir. 2005)...................................................................6, 13, 14

*CFPB v. Snap Fin. LLC*,
    2024 WL 3625007 (D. Utah Aug. 1, 2024) ...........................................................19

*City of New York v. Fedex Ground Package Sys., Inc.*,
    314 F.R.D. 348 (S.D.N.Y. 2016) ...........................................................................10

*In re Davis*,
    194 F.3d 570 (5th Cir. 1999) ................................................................................15

*Empire Healthchoice Assurance v. McVeigh*,
    547 U.S. 677 (2006)...............................................................................................16

*Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*,
    545 U.S. 308 (2005).......................................................................................*passim*

*Gunn v. Minton*,
    568 U.S. 251 (2013).......................................................................................*passim*

*New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A.*,
    824 F.3d 308 (2d Cir. 2016)...........................................................12, 14, 19, 20

*Marcus v. AT&T Corp.*,
    138 F.3d 46 (2d Cir. 1998)......................................................................................6

*Mid Atl. Med. Servs., LLC v. Sereboff*,
    407 F.3d 212 (4th Cir. 2005) ..................................................................................8

*Mims v. Arrow Fin. Servs., LLC*,
    565 U.S. 368 (2012)...........................................................................6, 7, 8, 12

*NASDAQ OMX Grp., Inc. v. UBS Securities, LLC*,
    770 F.3d 1010 (2d Cir. 2014)................................................................................16

*People v. Acima Digital LL*,
    No. 452225/2024.....................................................................................................18

*People v. Sirius XM Radio Inc.*,
    1:24-cv-00413, ECF 11 (S.D.N.Y. Feb. 7, 2024) ...................................................................11

*People v. Sirius XM Radio Inc.*,
    735 F. Supp. 3d 272 (S.D.N.Y. 2024) ........................................................................... *passim*

*Romano v. Kazacos*,
    609 F.3d 512 (2d Cir. 2010) .......................................................................................11

*Shaumyan v. Sidetex Co.*,
    900 F.2d 16 (2d Cir. 1990) .......................................................................................19

*People ex rel. Spitzer v. Frink Am., Inc.*,
    2 A.D.3d 1379 (N.Y. App. Div. 2003) ...................................................................9, 10

*State v. Cortelle Corp.*,
    38 N.Y.2d 83 (1975) ..................................................................................................9

*State v. Exxon Mobil Corp*,
    83 F.4th 122 (2d Cir. 2023) .....................................................................................10

*State v. Pennsylvania Higher Ed. Assistance Agency*,
    2020 WL 2097640 (S.D.N.Y. May 1, 2020) ...........................................................20

*Tantaros v. Fox News Network, LLC*,
    12 F.4th 135 (2d Cir. 2021) .....................................................................................12

*Vestron, Inc. v. Home Box Office, Inc.*,
    839 F.2d 1380 (9th Cir. 1988) ...................................................................................8

**Statutes and Regulations**

32 C.F.R. § 232.3(h) ........................................................................................................16

12 C.F.R § 1005.2(f) .......................................................................................................16

10 U.S.C. § 987 ...............................................................................................................16

12 U.S.C. § 5481(15)(A)(i) .....................................................................................5, 14, 15

12 U.S.C. § 5512 .............................................................................................................18

12 U.S.C. § 5531 .................................................................................................4, 14, 15, 18

12 U.S.C. § 5552(a) ...............................................................................................9,18,20

12 U.S.C. § 5565(b) ..........................................................................................................8

12 U.S.C. § 5565(c) ..........................................................................................5, 8, 10, 13

15 U.S.C. § 1602(f) .................................................................................................16

15 U.S.C. § 1691 .....................................................................................................16

28 U.S.C. § 1331 ...............................................................................................6, 7, 12

28 U.S.C. § 1367(a) ..............................................................................................6, 7

28 U.S.C. § 1441 ........................................................................................................6

**Other Authorities**

Wright, Miller, Cooper and Freer, 13D Fed. Prac. & Proc. Juris. § 3562 (3d ed.). ........................8

## INTRODUCTION

New York's suit against MoneyLion raises a critical question of federal law that should be heard in federal court.  New York contends that MoneyLion has violated the federal Consumer Financial Protection Act, 12 U.S.C. § 5481 *et seq.*, (CFPA) by offering an earned-wage-advance (EWA) product called Instacash, which allows customers to obtain advances on wages that they have already earned but not yet been paid.  Customers pay no interest or fees to get an Instacash advance; they need not undergo a credit check; and they have no legal obligation to repay the advance.  Thus, if a customer fails to repay an advance, MoneyLion has no legal claim against the customer, and the customer's credit is not adversely affected.  Instead, the only consequence is the customer cannot obtain future advances.  The EWA market is surging nationwide, and many EWA products share Instacash's no-obligation-to-repay design.

New York's CFPA claims against MoneyLion depend on a significant question of federal statutory interpretation: Does a company "extend[] credit," 12 U.S.C. § 5481(15)(A)(i), to a consumer when it offers them an advance on their already earned wages, but does not require them to repay that advance?  The answer to that question could affect whether other federal consumer-protection statutes—including the CFPA, Truth in Lending Act (TILA), Equal Credit Opportunity Act (ECOA), Electronic Funds Transfer Act (EFTA), and Military Lending Act (MLA)—apply to EWA products.  And the answer will impact not just MoneyLion, but the national market for EWA products and the millions of consumers who have accessed over $30 billion in advances as an alternative to costly payday loans.  Because this case presents a federal legal issue with nationwide implications, it belongs in federal court.

New York nonetheless seeks to evade federal jurisdiction by citing a state-law provision, New York Exec. Law § 63(12), and claiming its Complaint alleges "exclusively state-law claims."  But Section 63(12) is purely procedural: It allows the Attorney General to sue based on violations

of *other* laws and seek certain expedited remedies.  It does not create the substantive claim or provide the civil penalties the Attorney General is pursuing here.  Instead, it is the other law that New York alleges was violated, and that other law is federal—the CFPA.  And the Attorney General did not even seek the special, expedited procedures that Section 63(12) authorizes, which confirms that she cites Section 63(12) only to divert the case from federal court.  The Court should reject New York's transparent attempt to seek home-court advantage through the artifice of Section 63(12).

## **BACKGROUND**

### A.    **MoneyLion's Instacash Product**

Workers' wages have long been paid on a monthly or biweekly basis.[1]  But workers have ongoing expenses within their pay cycles, which creates a demand for short-term liquidity.[2]  Although credit cards can partially address that need for some workers, many lack the requisite credit scores to qualify; and even for those who do, cards often carry high interest rates and late fees.  Until recently, other alternatives—such as payday loans—were risky and costly.  EWA products are a recent, market-driven solution to the problem of short-term liquidity.  Through the use of technology, EWA providers can measure a person's already earned wages and advance a certain amount of those wages to them at no or low cost.[3]

---

[1] *See FTA Comment Letter re: the CFPB Request for Comment on its Earned Wage Access Proposed Interpretive Rule* at 2, Fin. Tech. Ass'n (Aug. 30, 2024), *available at* https://www.ftassociation.org/wp-content/uploads/2024/08/FTA-EWA-Interpretive-Rule-Comment-Letter.pdf ("FTA Letter") (last visited July 16, 2025).

[2] *See AFC Comment Letter re: 2024 Paycheck Advance Interpretive Rule* at 2–3, Am. Fintech *Council* (Aug. 29, 2024), *available at* https://www.fintechcouncil.org/advocacy/comment-letter-on-cfpb-2024-paycheck-advance-interpretive-rule-docket-no-cfpb-2024-0032  ("AFC Letter") (last visited July 16, 2025).

[3] *See id.* at 1-3.

The MoneyLion platform is a one-stop-shop for consumers seeking financial education and empowerment. It offers an array of products for people in a range of circumstances, from credit builder loans for those seeking to improve their positive payment history, to automated investment portfolios for those looking to grow their wealth.

One product offered by MoneyLion—Instacash—is an EWA service, allowing users to request an advance of their earned wages. (ECF 1 ¶ 1.) To sign up for Instacash, users link their bank account, and MoneyLion decides whether to approve them for Instacash based on whether it can detect recurring wages. (*See* Am. Compl. ¶¶ 44-46.) Instacash has no impact on a user's credit score, and a credit check is not required. (ECF 1 ¶ 1.) A MoneyLion user who elects to receive an Instacash advance can do so for free—there are no interest charges or fees for Instacash advances sent through standard delivery. (*Id.*) Users can also elect to expedite their Instacash advance, so it arrives within minutes, by paying an optional expedited-funding fee. (*Id.*) And MoneyLion also allows—but does not require—users to provide an optional tip to show their appreciation for the service. (*Id.*)

When customers request Instacash, they authorize MoneyLion to debit their checking account in the amount of the advance, along with any optional expedited-funding fee or optional tip, on a scheduled repayment date, typically the day when customers receive a direct deposit from their employer. (Am. Compl. ¶ 41.) Customers can cancel the repayment simply by removing their designated checking account through the MoneyLion mobile application. (ECF 1, ¶ 1.) If a customer does not repay on the scheduled date, they face no late fees or penalties, experience no adverse credit impact, and do not have the repayment amount rolled over to the next month. (*Id.*) Payment revocations also cancel repayment of expedited-funding fees and tips, which are debited only if and when an advance is repaid. (*Id.*) The lone consequence of non-payment is that

MoneyLion will not approve the customer for a new advance until the prior advance is repaid.[4] (*Id.*)  Companies like MoneyLion can offer non-recourse advances because of the product's design: Just as EWA advances are limited to the customer's estimated earned wages, so is MoneyLion's risk in the case of non-payment.[5]

### B.    The State's Complaint

On April 15, 2025, the State sued MoneyLion in New York state court.  On April 28, 2025, New York amended its complaint to include additional MoneyLion defendants.  (ECF 1-2 Am. Compl.).  The Amended Complaint describes Instacash as "a modern, technology-driven attempt to evade New York's usury laws," and contends that Instacash is "usurious lending," "contraven[ing] centuries of New York law and policy."  (*Id.* ¶ 3.)  The First through Fifth Causes of Action assert purely state-law claims, alleging usury, fraud, deceptive practices, and false advertising, in violation of New York law.  (*Id.* ¶¶ 132-159.)

The Sixth and Seventh Causes of Action take a different tack.  Those claims allege that MoneyLion violated a provision of the CFPA, 12 U.S.C. § 5531, that prohibits "deceptive" and "abusive" practices, "in connection with [a] transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service," *id.* § 5331(a) and (d); (*see* Am. Compl. ¶¶ 160-179.)  The Amended Complaint explains that "[t]he CFPA is a federal consumer law" and asserts that MoneyLion is "a 'covered person[]'" under that law because it "is offering a 'consumer financial product or service.'"  (Am. Compl. ¶¶ 162, 164.)  While the

---

[4] Instacash's no-obligation features are reflected across the MoneyLion app and website, which include Terms and Conditions stating that: "**INSTACASH IS NOT A LOAN. MONEYLION IS NOT LENDING YOU MONEY IN CONNECTION WITH THE INSTACASH SERVICE. THERE IS NO OBLIGATION TO REPAY AN INSTACASH ADVANCE.**"  *See* https://www.moneylion.com/terms-and-conditions/instacash/ (last visited July 16, 2025).

[5] *See* AFC Letter, *supra* note 3, at 7.

Amended Complaint does not explain why Instacash allegedly qualifies as a "consumer financial product," it repeatedly and conclusorily refers to Instacash as "credit." (*Id.* ¶¶ 3, 9, 70, 92, 164, 171, 173(a).) The Sixth and Seventh Causes of Action thus depend on the premise that Instacash involves "extending credit." 12 U.S.C. § 5481(15)(A)(i). The CFPA defines "credit" as "the right granted by a person to a consumer to defer payment of a debt" or "incur debt and defer its payment." *Id.* § 5481(7).

The Sixth and Seventh Causes of Action also cite New York Executive Law § 63(12). (Am. Compl. ¶¶ 161, 168.) That provision states that "[w]henever any person shall engage in . . . illegal acts" while conducting "business" in New York, the "attorney general may apply . . . to the supreme court of the state of New York, on notice of five days, for an order enjoining" the "illegal acts" and seek "restitution and damages." N.Y. Exec. L. § 63(12). Accordingly, the provision allows the Attorney General to seek special, expedited state-court remedies based on "illegal acts" under some other law. Here, the Sixth and Seventh Causes of Action cite Section 63(12) while claiming that the predicate "illegal act" is MoneyLion's alleged violation of the CFPA. But the Attorney General did not invoke Section 63(12)'s special, expedited procedures and remedies; instead, she filed an ordinary complaint on an ordinary timeline.

The Amended Complaint seeks an injunction and various state-law remedies, such as restitution, damages, and disgorgement. (Am. Compl. at 38.) But it also seeks a federal-law remedy—namely, "appropriate civil money penalties against Defendants as authorized by 12 U.S.C. 5565(c)." *Id.* Section 5565(c) is a CFPA provision that allows the Consumer Financial Protection Bureau (CFPB) to seek civil money penalties against those who violate "any provision of Federal consumer financial law." 12 U.S.C. 5565(c)(1). The provision does not mention States or their ability to seek civil money penalties.

On May 15, 2025, MoneyLion filed its Notice of Removal to federal court.  (ECF 1.)  On June 16, 2025, New York moved to remand the case back to state court.  (ECF 14.)

## ARGUMENT

Under 28 U.S.C. § 1441, a defendant in a civil action filed in state court may remove the case to federal court if the case "originally could have been filed in federal court."  *See Marcus v. AT&T Corp.*, 138 F.3d 46, 52 (2d Cir. 1998).  Removal is permitted as long as at least one claim falls within the original jurisdiction of the federal court.  *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 194 (2d Cir. 2005); 28 U.S.C. § 1367(a).  And once a case is properly removed to federal court, the court has no discretion "to decline the exercise of jurisdiction which is given."  *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 376 (2012) (citation omitted).

This Court has original jurisdiction over this action under the federal-question statute, 28 U.S.C. § 1331, for two reasons.  First, New York's Sixth and Seventh Causes of Action raise claims created by federal law.  Claims arise under federal law when "federal law creates the right of action and provides the rules of decision."  *Mims*, 565 U.S. at 377.  Here, the CFPA provides the right of action and rules of decision for the Sixth and Seventh Causes of Action.  New York's citation of Executive Law § 63(12) does not suggest otherwise.  That statute is purely procedural— not substantive—and New York did not even avail itself of Section 63(12)'s special procedures in any event.

Second, even if the Sixth and Seventh Causes of Action have their origins in state law, federal-question jurisdiction exists under the test set forth in *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).  Because those causes of action turn on whether MoneyLion violated Section 5331, they "necessarily raise[]" a federal question that is "actually disputed" by the parties.  *Gunn v. Minton*, 568 U.S. 251, 258 (2013).  And that federal question is "substantial" and suitable for "resolution in federal court" because it presents a federal statutory-

construction issue with far-reaching implications, *id.*—namely, whether EWA products involve an extension of "credit" under federal consumer-protection law.  Indeed, it would make little sense for a state court to resolve such a profoundly national legal issue.  Accordingly, federal-question jurisdiction exists over New York's suit, and the Court should deny New York's motion to remand.[6]

## I.    REMOVAL WAS PROPER BECAUSE THE STATE PLEADS CLAIMS THAT ARE CREATED BY FEDERAL LAW

Federal-question jurisdiction lies here for a straightforward reason: New York's Sixth and Seventh Causes of Action raise claims that are created by Section 5331 of the CFPA.  New York cannot escape federal jurisdiction simply by citing the state-law procedural vehicle in Executive Law § 63(12).

### A.    The Sixth and Seventh Causes of Action Assert Federal Rights and Seek Federal Remedies

"[W]hen federal law creates a private right of action and furnishes the substantive rules of decision, the claim arises under federal law, and district courts possess federal-question jurisdiction under § 1331."  *Mims*, 565 U.S. at 378-379.  Here, the Sixth and Seventh Causes of Action invoke Section 5331 of the CFPA as the applicable "right of action" and "substantive rule[] of decision."  *Id.*  They explain that "[t]he CFPA is a federal consumer law that prohibits covered persons or service providers from committing or engaging in a deceptive, unfair, or abusive act or practice under federal law in connection with any transaction with a consumer for a consumer financial product."  (Am. Compl. ¶ 162; *see id.* ¶ 169.)  They assert that MoneyLion is a "'covered

---

[6] If the Court finds federal-question jurisdiction over Causes of Action Six and Seven, it should also exercise supplemental jurisdiction over Causes of Action One through Five because those claims are "so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367(a).

person' within the meaning of the CFPA" because it purportedly "offer[s] a 'consumer financial product or service.'" (*Id.* ¶ 164.) And they claim that "MoneyLion has engaged in deceptive" and "abusive" "practices in connection with its Instacash product," in violation of the CFPA. (*Id.* ¶¶ 165, 169.) Thus, Section 5331 plainly "creates" New York's Sixth and Seventh Causes of Action. *Mims*, 565 U.S. at 378.

Federal-question jurisdiction is confirmed by New York's request for a federal remedy. Courts find federal-question jurisdiction where the plaintiff's complaint seeks a remedy expressly created by federal law. *See, e.g., Mid Atl. Med. Servs., LLC v. Sereboff*, 407 F.3d 212, 217 n.5 (4th Cir. 2005) (finding federal-question jurisdiction because the plaintiff's "complaint seeks 'equitable relief,'" and "ERISA authorizes an action for 'other appropriate equitable relief'"); *Vestron, Inc. v. Home Box Off., Inc.*, 839 F.2d 1380, 1382 (9th Cir. 1988) (finding federal-question jurisdiction because the complaint "seeks remedies expressly created by federal copyright law"). The State's Complaint here does just that: It asks the court to "impos[e] appropriate civil money penalties against Defendants as authorized by 12 U.S.C. 5565(c)." (Am. Compl. at 38); *see* 12 U.S.C. § 5565(c) (requiring violators of the CFPA to "forfeit and pay a civil penalty pursuant to this subsection"). Where, as here, "federal law provides both the substantive right and a remedy for that right," "there is little difficulty" in finding federal-question jurisdiction. Wright, Miller, Cooper and Freer, 13D Fed. Prac. & Proc. Juris. § 3562 (3d ed.).[7]

---

[7] On the merits, MoneyLion disputes that a State can ever obtain civil money penalties under Section 5565(c)—which speaks only to the Bureau's authority and never mentions States. *See* 12 U.S.C. § 5565(c)(5) (providing for civil money penalties only after "the appropriate court has ordered such assessment and entered judgment in favor of the Bureau"). In contrast, Section 5565(b) provides for the recovery of costs "[i]n any action brought by the Bureau, *a State attorney general, or any State regulator* to enforce any Federal consumer financial law." 12 U.S.C. § 5565(b) (emphasis added). Thus, when Congress wanted to authorize state remedies in Section 5565, it did so expressly. But for purposes of the jurisdictional question here, the key point is that New York's complaint seeks a remedy created by federal law.

**B.      The State's Citation of Executive Law § 63(12) Does Not Alter the Analysis**

Congress gave states an express mechanism for asserting CFPA claims like the ones New York raises here.  Specifically, 12 U.S.C. § 5552(a) provides that "any State may bring a civil action in the name of such State in any [federal] district court . . . or in State court that is located in that State . . . to enforce provisions of" the CFPA and "to secure remedies under" the CFPA. Notwithstanding Section 5552(a), New York sought to avoid federal-question jurisdiction by citing Executive Law § 63(12).

Section 63(12) provides that "[w]henever any person shall engage in repeated fraudulent or illegal acts," the Attorney General may, "on notice of five days," seek an expedited "order enjoining" such acts, as well as "restitution and damages."  But here, New York did not pursue Section 63(12)'s special, expedited proceedings.  Rather, it simply filed an ordinary state-court complaint on an ordinary timeline.  New York therefore cited Section 63(12) to evade federal-question jurisdiction and keep this case in state court.

New York's gambit should be rejected.  New York courts have long held that Section 63(12) "*create[s] no new claims* but only provide[s] *particular remedies and standing* in a public officer to seek redress on behalf of the State and others."  *State v. Cortelle Corp.,* 38 N.Y.2d 83, 86 (1975) (emphasis added); *accord People ex rel. Spitzer v. Frink Am., Inc.*, 2 A.D.3d 1379, 1380 (4th Dept 2003) ("Section 63(12) does not create any new causes of action, but does provide the Attorney General with standing to seek redress and additional remedies for recognized wrongs.") (internal citation omitted).  Section 63(12) therefore lacks independent substantive force; it is a procedural and remedial provision that turns exclusively on the existence of predicate "illegal acts" under some *other* law.  Because the Sixth and Seventh Causes of Action here allege illegal acts under the CFPA, those claims plainly arise under federal law.

Moreover, the "particular remedies" Section 63(12) makes available are limited to "injunctive relief, restitution, [and] damages." *City of New York v. Fedex Ground Package Sys., Inc.,* 314 F.R.D. 348, 361-62 (S.D.N.Y. 2016); *see Frink Am.,* 2 A.D.3d at 1380. As a result, the State's authority to seek civil penalties against MoneyLion here—if it exists at all—would not derive from Section 63(12), but rather exclusively from Section 5565(c) of the CFPA. *See Fedex,* 314 F.R.D. at 362. While the State vaguely asserts that Section 63(12) "grants to courts the authority to impose penalties . . . by reference to the statutes . . . that give rise to the illegality at issue," its cited cases do not discuss that issue at all. (Mem. at 10 (citing *People v. Apple Health & Sports Clubs,* 80 N.Y.2d 803, 806-07 (1992); *People v. Two Wheel Corp.,* 71 N.Y.2d 693, 696-97 (1988)).) In sum, Section 63(12) is neither a source of independent claims, nor statutory authority for civil penalties. *Fedex,* 314 F.R.D. at 362.

New York's reliance on *State v. Exxon Mobil Corp,* 83 F.4th 122 (2d Cir. 2023), is misplaced. (*See* Mem. at 9.) In *Exxon*, Connecticut pleaded only claims under its state unfair and deceptive trade practices law, *without* any reference to substantive federal claims or federal remedies. *Exxon*, 83 F.4th at 133 ("all eight of Connecticut's CUTPA claims 'exclusive[ly] rel[y] on state law.'") (quoting *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392 (1987)). Here, by contrast, the Sixth and Seventh Causes of Action assert no claims under substantive state law; they assert claims under substantive federal law.

Nor is MoneyLion invoking the "artful pleading" doctrine to argue that New York alleges federal claims. (*See* Mem. at 9 (citing *Exxon*, 83 F.4th at 133-34).) Under the "well-pleaded complaint rule," "federal question jurisdiction generally 'exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint.'" *Exxon*, 83 F.4th at 132 (citation omitted). In turn, the artful pleading doctrine creates an exception to that rule "when

Congress has either (1) so completely preempted, or entirely substituted, a federal law cause of action for a state one that plaintiff cannot avoid removal by declining to plead 'necessary federal questions,' [] or (2) expressly provided for the removal of particular actions asserting state law claims in state court." *Romano v. Kazacos*, 609 F.3d 512, 519 (2d Cir. 2010). Here, the Sixth and Seventh Causes of Action satisfy the well-pleaded complaint rule because they present federal questions under the CFPA on their face. MoneyLion therefore has no need to rely on the "artful pleading" doctrine at all.

Finally, the decision in *People v. Sirius XM Radio Inc.*, 735 F. Supp. 3d 272 (S.D.N.Y. 2024), does not assist New York either. In that case, the respondent did not make the argument that MoneyLion makes here—namely, that New York's claim citing Section 63(12) was actually a federal claim styled as a state claim. *See People v. Sirius XM Radio Inc.*, 1:24-cv-00413, ECF 11 (S.D.N.Y. Feb. 7, 2024). Accordingly, the court did not grapple with any such contention, instead simply proceeding to the *Grable* analysis. *Sirius*, 735 F. Supp. 3d at 276. Moreover, the State in *Sirius* brought a special, expedited proceeding under Section 63(12) and sought only the relief authorized directly by Section 63(12)—thus providing at least the facade of a genuine state-law action. *See id.* at 281. Here, by contrast, the State filed an ordinary civil complaint and sought federal remedies—transparently revealing that its citation of Section 63(12) was nothing more than a superficial label.

## II.    REMOVAL WAS PROPER BECAUSE THE STATE'S CLAIMS RAISE A DISPUTED AND SUBSTANTIAL FEDERAL ISSUE

Federal jurisdiction is also present because the State's claims necessarily raise disputed and substantial federal issues. It is "common[] sense" that "a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum

offers on federal issues." *Grable*, 545 U.S. at 312. That form of federal-question jurisdiction, often referred to as *Grable* jurisdiction, will lie "if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S at 258. Here, even if the Court views the Sixth and Seventh Causes of Action as being "created by state law," those "claim[s] require[] resolution of significant issues of federal law" and thus "arise under federal law for 28 U.S.C. § 1331 purposes." *Mims*, 56 U.S. at 379 n.9.

### A.    The State's Claims Necessarily Raise a Federal Issue

The first *Grable* prong "is met where 'the plaintiff's right to relief necessarily depends on resolution of a . . . question of federal law.'" *Tantaros v. Fox News Network*, *LLC*, 12 F.4th 135, 141 (2d Cir. 2021) (quoting *Empire Healthchoice Assurance v. McVeigh*, 547 U.S. 677, 690 (2006)). The State concedes that element is satisfied here because succeeding on Causes of Action Six and Seven requires New York to establish that MoneyLion violated the CFPA. (Mem. at 14.) As already explained, Section 63(12) contains no substantive prohibition and instead creates procedural rights and remedies based on otherwise "illegal acts." The alleged "illegal act[]" in the Sixth and Seventh Causes of Action is a violation of Section 5331 of the CFPA—a federal law. (*See* Am. Compl. ¶¶ 160-179.) In other words, the Sixth and Seventh Causes of Action are "plainly predicated on a violation of federal law" because MoneyLion's "purported violations of [the CFPA] are the basis for the State's allegation that [MoneyLion] engaged in conduct that is violative of New York Executive Law § 63(12)." *Sirius*, 735 F. Supp. 3d at 277; *see New York ex rel. Jacobson v. Wells Fargo Nat'l Bank*, *N.A.*, 824 F.3d 308, 315 (2d Cir. 2016) ("A state law claim necessarily raises federal questions where the claim is affirmatively premised on a violation of federal law."). Unsurprisingly, then, the State "does not dispute that whether Defendants violated

the CFPA's prohibitions on deceptive or abusive practices is a question that is necessarily raised."
(Mem. at 14.)

Although the Court need not address the issue, the State's requested remedy for Causes of
Action Six and Seven also necessarily raises federal issues.  The State seeks "appropriate civil
money penalties against Defendants as authorized by 12 U.S.C. 5565(c)."  (Am. Compl. at 38.)
But to award such relief, a court would need to first determine whether States—as opposed to the
CFPB alone—have a federal-law right under Section 5565(c) to obtain civil money penalties.  *But
see* 12 U.S.C. § 5565(c)(5)(B) (allowing civil penalty only when "the appropriate court has ordered
such assessment and entered judgment in favor of the *Bureau*") (emphasis added).  And even
assuming the answer was yes, the court would then need to further immerse itself in federal law
by applying Section 5565(c), which contains different thresholds for "[p]enalty amounts," requires
consideration of "[m]itigating factors," and establishes procedures for "[n]otice and hearing."  12
U.S.C. § 5565(c).  "[T]he fact that the Court cannot award the relief requested by the State without
reaching . . . federal question[s] is further evidence that the Court must reach the federal issue to
resolve this case."  *Sirius*, 735 F. Supp. 3d at 277.[8]

### B.    The Federal Issue Implicated Is Actually Disputed

A federal issue is "actually disputed" when the parties "have a dispute respecting the effect
of [federal] law."  *Gunn*, 568 U.S. at 259 (bracketed material in original).  "[T]here can be no
doubt that the 'actually disputed' factor of the test is satisfied when the federal issue is 'the only'

---

[8] Because the State concedes that its claims necessarily raise a federal issue, its argument that
demanding federal civil penalties does not necessarily raise a federal issue is irrelevant.
Nonetheless, while New York's argument is a red herring, it misconstrues what "necessarily
raised" means, because *Grable* jurisdiction arises where a substantial federal question must be
decided for the plaintiff "to prevail" on its claim for relief, *Gunn*, 568 U.S. at 259, and it is not
derailed by the many "alternative ways in which a claim could fail."  *See Broder*, 418 F.3d at 196.

or 'the central' point in dispute." *Jacobson*, 824 F.3d at 316.  That is the case here.  The Sixth and Seventh Causes of Action are premised on the claim that MoneyLion violated Section 5531 by offering Instacash to consumers.  MoneyLion contends that Instacash does not violate Section 5531 because (among other things) it does not involve extending "credit."  12 U.S.C. § 5481(15)(A)(i).  New York contends the opposite.  Accordingly, the federal-law issue of whether Instacash violates Section 5331 is "actually disputed."  *Gunn*, 568 U.S. at 259.

New York maintains that the federal issue is not disputed because, in its view, "the meaning of the federal statute" is not contested.  (Mem. at 14 (citation omitted).)  But that argument misunderstands *Grable*'s second prong.  That prong is satisfied not only when the parties "disagree over the interpretation of a statute or regulation," but also when the parties "disagree over whether there has been compliance with or violation of federal law."  *Barone v. Bausch & Lomb, Inc.*, 372 F. Supp. 3d 141, 148 (W.D.N.Y. 2019); *see id.* (citing cases).  In *Broder*, for instance, the Second Circuit found the "actually disputed" prong met when the parties contested only whether the defendant violated a statutory requirement—not the meaning of that requirement.  418 F.3d at 195.

In any event, this case *does* present a "dispute over the scope or meaning of federal law." (Mem. at 14.)  Section 5531 prohibits certain "unfair" or "abusive" "act[s] or practice[s]," but only if they are "in connection with a transaction with a consumer for a consumer financial product or service."  12 U.S.C. § 5531(c) and (d).  In turn, the CFPA defines "financial product or service" to include "extending credit."  *Id.* § 5481(15)(A)(i).  And it defines "credit" to "mean[] the right granted by a person to a consumer to defer payment of a debt."  *Id.* § 5481(7).

MoneyLion's principal contention is that Section 5531's prohibitions do not apply to Instacash because Instacash does not involve the "exten[sion of] credit."  *Id.* § 5481(15)(A)(i).  An extension of credit requires that a borrower incur a "debt," *id.* § 5481(7)—*i.e.*, an obligation to

14

repay the borrowed sum of money. *See Debt*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/debt?src=search-dict-box ("being under obligation to pay or repay someone or something in return for something received") (last visited July 16, 2025); *In re Davis*, 194 F.3d 570, 577 (5th Cir. 1999) ("[T]he plain meaning of a 'debt' or 'claim' is 'nothing more or less than an enforceable obligation.'"). So when a consumer has no obligation to repay any money, they have not received an extension of credit. On that proper understanding of the statutory language, Instacash is not covered by Section 5531. After all, customers pay no interest or fees to get an Instacash advance on their wages; they need not undergo a credit check; and they have no legal obligation to repay the advance. As a result, if a customer fails to repay an advance, MoneyLion has no legal claim against the customer, and the customer's credit is not adversely affected. The only consequence is that the customer cannot obtain future advances. Such a product does not involve the "exten[sion of] credit," 12 U.S.C. § 5481(15)(A)(i)—and thus does not trigger Section 5531's prohibitions.

New York seeks to distract from this core legal dispute by suggesting that MoneyLion's only argument "is that the *facts* adduced in this litigation" will not satisfy the statutory standard for deception or abuse. (Mem. at 14 (emphasis added).) But that suggestion is plainly wrong. As just explained, MoneyLion plans to raise a critical question of statutory interpretation—namely, whether a product with Instacash's features qualifies as "extending credit," 12 U.S.C. § 5481(15)(A)(i), and thereby triggers the CFPA's substantive prohibitions.

### C.    The Federal Issue Is Substantial

A federal issue is substantial when there is "a serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Grable*, 545 U.S. at 313. That inquiry looks not to the "importance of the issue to the plaintiff's case," but "to the importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 260. The substantiality element is ordinarily

satisfied when the issue concerns the interpretation of a "federal statute" and that interpretation "would be controlling in numerous other cases." *Empire Healthcoice*, 547 U.S. at 700; *see Grable*, 545 U.S. at 314-15 (holding that an interpretive question about an IRS statute was substantial); *NASDAQ OMX Grp., Inc. v. UBS Securities, LLC*, 770 F.3d 1010, 1024 (2d Cir. 2014) (holding that the question "whether NASDAQ violated its Exchange Act obligation[s]" was "sufficiently significant to the development of a uniform body of federal securities regulation" to be substantial). By contrast, "fact-bound and situation specific" federal issues will normally be deemed insubstantial. *Empire Healthchoice*, 547 U.S. at 701.

This case turns on an issue of statutory interpretation that "would be controlling in numerous other cases." *Id.* at 700. Once a product qualifies as consumer "credit," it may trigger obligations under the CFPA, and potentially implicate the application of other federal consumer-protection laws regulating consumer credit, including TILA, ECOA, EFTA, and MLA.[9] Judicial decisions about whether EWA products—which have no repayment obligations—qualify as extensions of "credit" will thus impact the application of federal consumer-protection law in numerous cases. It would make little sense for a state court to decide such a broadly significant question of federal law.

That is particularly true because the economic and policy significance of the national EWA industry is substantial and growing. A 2024 CFPB report estimated that in 2022, 10 million consumers accessed $31.9 billion through EWA transactions. CFPB, *Data spotlight:*

---

[9] *See* 15 U.S.C. §§ 1602(f) (defining "credit" under TILA) and 1638 (requiring disclosures in connection with a "consumer credit transaction"); 15 U.S.C. §§ 1691 (prohibiting discrimination with respect to "credit transactions") and 1691-a(d) (defining "credit" under EOCA); 12 C.F.R § 1005.2(f) (defining "credit" under EFTA); 10 U.S.C. § 987 (prohibiting certain terms in connection with "extension of consumer credit" to members of the armed forces) and 32 C.F.R. § 232.3(h) (defining "credit" under MLA).

*Developments in the Paycheck Advance Market*, July 18, 2024.[10]  The CFPB has observed rapid growth in the industry, with the use of employer-partnered EWA products doubling in just one year.  *Id.*  In the wake of the EWA industry's expansion, the federal government has become increasingly focused on EWA products.  The CFPB has engaged in "continued monitoring of the earned wage product market."  *Id.*  In 2020, the CFPB issued an initial interpretive regulation addressed to a narrow subset of EWA products, and in 2024, the CFPB issued a proposed interpretive regulation addressing whether EWA products more generally would be treated as "credit" under TILA and its implementing regulations.  *Truth in Lending (Regulation Z); Consumer Credit Offered to Borrowers in Advance of Expected Receipt of Compensation for Work* 12 C.F.R Part 1026, Docket No. CFPB-2024-0032.[11]  Accordingly, the federal statutory-interpretation issue here unquestionably affects a fast-growing national industry that has attracted federal regulatory interest.  That federal issue is undoubtedly "substantial" under *Grable*.

The State's reliance (Mem. at 16) on *Sirius*'s substantiality analysis is misplaced.  There, the court found insubstantial a federal issue concerning whether Sirius Radio's "cancellation procedures violated" a federal law called the Restore Online Shoppers' Confidence Act (ROSCA). 735 F. Supp. 3d at 275.  But that issue was meaningfully distinct from the one here in two respects. First, it was "inextricably fact bound," because it involved only whether the respondent's subscription-cancellation procedures were sufficiently "simple."  *Id.* at 280.  Here, by contrast, the issue is purely legal—namely, whether EWA advances offered by MoneyLion and other companies across the country, which need not be repaid, qualify as extensions of "credit" under

---

[10] Available at: https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/ (last visited July 16, 2025).

[11] The CFPB withdrew the proposed regulation following the change in presidential administrations.

federal law.  Second, no federal agency could "issue implementing regulations" under ROSCA, *id.* at 279, which diminished the federal interest in the issue.  Conversely, here, the CFPB can issue regulations implementing the CFPA, including Section 5531.  *See* 12 U.S.C. § 5512.

Nor does Section 5552(a)(1) suggest that the issue here is insubstantial.  (*Contra* Mem. at 16.)  That provision specifies that state attorneys general "may bring a civil action" to enforce the CFPA in either federal district court "or in State court."  12 U.S.C. § 5552(a)(1).  But that provision simply shows that Congress viewed *some* CFPA actions as appropriate for either federal or state court.  It does not show that Congress viewed *all* such actions in that way—especially where, as here, the action raises a federal statutory-interpretation issue of national significance.  To the contrary, Congress plainly expected ordinary removal rules—including *Grable*—to apply to CFPA actions brought in state court.  Indeed, in recent litigation, the New York Attorney General has conceded that removal of CFPA claims is often proper.  *See* Reply Mem. in Supp. Mot. to Remand at 5, *State v. DailyPay Inc*., No. 25-civ-3439-JGK (June 23, 2025 S.D.N.Y.) ECF 19, (explaining that removal of CFPA claims often "would not cause any disruption").

The State also erroneously asserts (Mem. at 17) that whether "Paycheck Advances are loans and fees and tips" is solely a question "of New York law."  (*See* Am. Compl. ¶¶ 132-145.) That assertion directly contradicts the State's recent argument that analysis of consumer "credit" under the CFPA, TILA, and EFTA "did *not* involve an application of New York law."[12]  The State was right the first time.  As already shown, Causes of Action Six and Seven turn on application of federal law—and the key question under federal law is whether EWA products involve an extension of "credit."  If so, those advances could trigger federal consumer financial law

---

[12] *See* Mem. of Law in Opp. to Motion to Dismiss at 29, *People v. Acima Digital LL,* No. 452225/2024, NYSCEF No. 20 (Sup. Ct. New York County Nov. 6, 2024) (emphasis added). (Attached as Ex. 1).

obligations; if not, the federal obligations do not come into play.  The State cannot credibly confine the implications of this case to New York alone.  Unsurprisingly, courts have consistently found that similar questions raise federal, not state-law, issues.  *See*, *e.g.*, *CFPB v. Snap Fin. LLC*, 2024 WL 3625007, at \*4-9 (D. Utah Aug. 1, 2024) (interpreting and applying federal consumer financial protection law to determine that lease-to-own agreements were not "credit"); *Shaumyan v. Sidetex Co.*, 900 F.2d 16, 18-19 (2d Cir. 1990) (rejecting state-law characterization of home improvement contract to determine that contract was not "credit").

The State further argues (Mem. at 18) that "the Complaint concerns the conduct of MoneyLion—and that of MoneyLion alone."  But MoneyLion is one of a growing number of companies nationwide offering EWA products with the same essential feature: no indebtedness or repayment obligation.  The legal question here is whether such a product counts as an "extension of credit" under federal law.  There is a substantial federal interest in a decision on that question because it will provide precedent that guides future actions by the EWA industry and the CFPB.

### D.    The Federal Issue Is Properly Adjudicated in Federal Court

The final *Grable* prong asks whether "the federal issue [is] . . . [one] a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  545 U.S. at 314.  This prong "focuses principally on the nature of the claim, the traditional forum for such a claim, and the volume of cases that would be affected."  *Jacobson*, 824 F.3d at 316.  "Absent a special state interest in a category of litigation, or an express congressional preference to avoid federal adjudication, federal questions that implicate substantial federal interests will often be appropriately resolved in federal rather than state court."  *Id.*

The "nature of the claim" here is an alleged violation of the CFPA.  *Id.*  The "traditional forum" for CFPA claims is federal court, *id.*—and in fact, federal courts also regularly adjudicate suits involving Executive Law Section 63(12) where, as here, they are predicated on federal-law

violations. *See*, *e.g.*, *State v. Pennsylvania Higher Ed. Assistance Agency*, 2020 WL 2097640 (S.D.N.Y. May 1, 2020). A substantial "volume of cases"—implicating at least five federal consumer-protection statutes—would be affected by the resolution of the federal issue here. *Jacobson*, 824 F.3d at 316. And there is obviously no "special state interest" in litigation over the meaning of *federal* consumer-protection law. *Id.*

New York again emphasizes (Mem. at 21) that Congress authorized state attorneys general to bring suits to enforce the CFPA in either state or federal court. *See* 12 U.S.C. § 5552(a)(1). But again, nothing in Section 5552(a)(1) suggests that by giving States that option, Congress sought to negate ordinary removal rules. A defendant sued by a state attorney general in state court under the CFPA can thus remove the case to federal court pursuant to those rules. That does not mean "that *any* action brought by a state attorney general in state court to enforce the CFPA's provisions" is necessarily "removable." (Mem. at 21.) It simply means that such actions are removable where, as here, the *Grable* prerequisites are satisfied.

Contrary to New York's suggestion (Mem. at 21-22), *Sirius* does not support the State's argument on the fourth *Grable* factor. There, in finding that the fourth factor was not satisfied, the court specifically emphasized that New York's Attorney General was "using powers that she was granted under state law to bring a special proceeding" in state court. *Sirius*, 735 F. Supp. 3d at 281. The court reasoned that exercising federal jurisdiction would "force the State to forgo the procedural mechanisms that are uniquely available to it in a special proceeding in a state forum to obtain 'expeditious' relief." *Id.* Here, by contrast, the Attorney General has simply filed an ordinary civil action against MoneyLion—not the expedited, special proceeding contemplated by Section 63(12).

New York also contends that exercising jurisdiction in this case "would materially burden federal courts." (Mem. at 23.) But just because a state statutory violation is predicated on an antecedent federal-law violation does not mean that all suits under such state statutes will be removable. Among other things, many such suits will fail *Grable*'s "substantiality" prong because, like the suit in *Sirius*, they will be "inextricably fact bound." 735 F. Supp. 3d at 280. This suit is fundamentally different because it raises a critical legal question of nationwide significance—namely, whether EWA products involve an extension of "credit" under the CFPA.

Finally, New York resorts to "considerations of comity," observing that "[t]he usury prohibitions at the center of the dispute reflect centuries of New York public policy regarding safe and responsible lending." (Mem. at 22.) Of course, if New York had solely asserted claims under its state usury laws, then its suit would be heard in state court. But instead, New York also sought to use a state procedural vehicle, Section 63(12), to sue MoneyLion under the CFPA, seeking federal remedies. Because New York invoked the CFPA in that manner, its suit necessarily raises a substantial federal law-issue. In that circumstance, "considerations of comity" are at their nadir and the interest in a federal forum is at its "zenith." *Id.*

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion to Remand.

Dated: New York, New York          COOLEY LLP
July 16, 2025

By:     */s/James Kim*
James Kim
Kaitland Kennelly
Reed A. Smith

55 Hudson Yards
New York, New York 10001
Phone: (212) 479-6000
Email: jameskim@cooley.com
kkennelly@cooley.com
reed.smith@cooley.com

and

Ephraim McDowell
(*pro hac vice* forthcoming)
COOLEY LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC  20004-2400
Phone: (202) 842-7800
Email: emcdowell@cooley.com

*Attorneys for MoneyLion Defendants*